# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-3736

KEVIN FOX and MELISSA FOX,

*Plaintiffs-Appellees,*

*v.*

EDWARD HAYES, MICHAEL GUILFOYLE,
SCOTT SWEARENGEN, BRAD WACHTL, and
WILL COUNTY,

*Defendants-Appellants,*

*v.*

AMERICAN ALTERNATIVE INSURANCE
CORPORATION and ESSEX INSURANCE
COMPANY,

*Intervenors-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7309—**John W. Darrah,** *Judge.*

ARGUED SEPTEMBER 9, 2009—DECIDED APRIL 7, 2010

Before FLAUM, EVANS, and WILLIAMS, *Circuit Judges*.

EVANS, *Circuit Judge*.  The central event underlying this case evokes what is surely every parent's most visceral fear. In the early morning hours of June 6, 2004, three-year-old Riley Fox was taken from her home in Wilmington, Illinois. She was bound with duct tape, sexually assaulted, and drowned in a creek. Riley's parents, Kevin and Melissa Fox, claim that in the midst of their efforts to cope with this trauma, local detectives subjected them to a whole new nightmare. According to the Foxes, the defendants framed Kevin for Riley's murder, coerced him until he agreed to a "confession" that the detectives concocted, and caused him to be jailed (and facing the death penalty) on a charge of first-degree murder. The prosecutor eventually dropped the charge after DNA testing excluded Kevin as the donor of DNA found on Riley's body. In the meantime, Kevin spent eight months in jail, separated from his grieving wife and seven-year-old son, while his reputation in the small community where they lived was thoroughly smeared. To this day, no one else has been charged with Riley's murder.

Almost immediately after his arrest, Kevin and Melissa brought this multi-count, multi-party lawsuit under 42 U.S.C. § 1983 and Illinois law, claiming that Will County detectives Edward Hayes, Michael Guilfoyle, Scott Swearengen, Brad Wachtl, John Ruettiger (who died before the trial), and several other parties who have since settled or been dismissed from the suit, arrested and prosecuted Kevin without probable cause and in violation of his due process rights. The complaint also includes counts of conspiracy, false imprisonment, intentional

infliction of emotional distress (IIED), and (for Melissa) loss of consortium. It sought both compensatory and punitive damages. Three years and multiple dispositive motions later, the case went to trial. After six weeks, the jury returned verdicts in favor of the Foxes against the five named defendants on all but the conspiracy and false imprisonment claims.

In its assessment of damages, the jury's verdict in favor of Kevin looked like this:

| Defendant | Due Process | False Arrest | Malicious Prosecution | IIED | Punitive Damages | Totals |
|---|---|---|---|---|---|---|
| Hayes | 500000 | 500000 | 300000 | 500000 | 1500000 | 3300000 |
| Swearengen | 500000 | 500000 | 300000 | 500000 | 1500000 | 3300000 |
| Guilfoyle | 300000 | 500000 | 0 | 200000 | 400000 | 1400000 |
| Wachtl | 300000 | 100000 | 0 | 200000 | 100000 | 700000 |
| Estate of Ruettiger | 100000 | 100000 | 0 | 200000 | 200000 | 600000 |
| Total | 1700000 | 1700000 | 600000 | 1600000 | 3700000 | 9300000 |

On Melissa's claims the jury found:

| Defendant | Loss of Consortium | IIED | Punitive Damages | Totals |
|---|---|---|---|---|
| Hayes | 1000000 | 1000000 | 1000000 | 3000000 |
| Swearengen | 1000000 | | 1000000 | 2000000 |
| Guilfoyle | 300000 | | 200000 | 500000 |
| Wachtl | 300000 | | 200000 | 500000 |
| Estate of Ruettiger | 100000 | | 100000 | 200000 |
| Totals | 2700000 | 1000000 | 2500000 | 6200000 |

The grand total of the damages awarded to the Foxes was $15.5 million. On motions after verdict, the district court struck all of the punitive damages awarded to Melissa ($2.5 million) and the punitive damages assessed against Wachtl ($100,000) on Kevin's claims. In addition, the district court entered an order memorializing the parties' agreement that the judgment against the Estate of John Ruettiger was satisfied and the case against it was dismissed. All of this has left the remaining tab at $12,200,000. It is that sum that is in play as the four named defendants—Hayes, Swearengen, Guilfoyle, and Wachtl—appeal.

Over the course of the long trial, the defendants and the Foxes presented drastically different versions of the

events surrounding Kevin's arrest and prosecution. In broad strokes, this is the defendants' version. From day one, Kevin's behavior raised red flags that made the defendants suspect he was involved in Riley's death. After investigating for four months, Kevin was their only suspect. In October they brought Kevin in for questioning, hoping that he could resolve their concerns. Instead, he made statements that further heightened their suspicions. When Kevin nonetheless denied involvement, the detectives suggested he take a polygraph examination. He did so voluntarily and failed. Their suspicions further raised, the defendants questioned him for several more hours, until Kevin admitted that he accidentally killed Riley. Kevin explained that on the night of Riley's death he accidentally hit her in the head with the bathroom door. Thinking he had killed her, he panicked. Instead of calling the police or an ambulance or a family member, Kevin bound Riley with duct tape to make it look like a murder and left her in the creek, where she drowned. The defendants had Kevin memorialize his statement on video and then arrested him for the murder of his daughter.

Because at this stage we review the evidence in the light most favorable to the Foxes, *see Staub v. Proctor Hosp.*, 560 F.3d 647, 651 (7th Cir. 2009), what follows are more particular details of their version of these events. In June 2004, Kevin and Melissa were living with their children, Riley and six-year-old Tyler, in Wilmington, a small town located in a rural area about 60 miles southwest of Chicago. Kevin was a union painter and Melissa stayed home with the kids. Kevin took pride in his

abilities as a dad, and he and Riley were particularly close. Melissa and Kevin both grew up in Wilmington and had an extended network of family and friends in town. Wilmington is the kind of place where crime is rare and people regularly leave their homes and cars unlocked. The Foxes were no exception. They often left their front door unlocked, and although the lock on their back door had been broken for months, they never bothered to fix it. Instead, they kept a stack of laundry baskets in front of the back door to keep it closed.

On June 5, 2004, a Saturday, Melissa was in Chicago with some friends to participate in a two-day walk to raise money for breast cancer research. Kevin took care of the children that afternoon and then dropped them off at the Wilmington home of Melissa's mother, who had agreed to watch the kids while he attended a concert in Chicago with Melissa's brother, Tony Rossi. Kevin and Tony drove the Foxes' Ford Escape to the concert, where Kevin drank about six beers. After the concert was over, around 10:30 p.m., Kevin and Tony went to a local restaurant with another friend. Kevin was sober when he and Tony left for Wilmington an hour later. Around 12:50 a.m. they arrived back at the Rossis' house, where Tyler and Riley were sleeping in the living room. Kevin wanted to bring the children home so he could get them up early the next morning and travel to Chicago in time to see Melissa finish her participation in the walk. Apparently the kids were looking forward to the trip to Chicago: they had gone to an art supply store with their father that Saturday afternoon, where he purchased three poster boards and other supplies; they went home and made

signs to hold up while watching their mother finish the walk. At the Rossi home later that night, Tony helped Kevin get the children into the car, and Kevin drove them home.

Before leaving for Chicago, Melissa had left the children's bed sheets in the dryer. When Kevin brought the kids in that night he was too tired to make their beds, so he put Tyler to sleep on an ottoman and Riley on the couch. They were within a few feet of each other in the living room. This wasn't an uncommon sleeping arrangement—the Foxes sometimes let the children fall asleep watching TV in the living room. After the children were sleeping, Kevin went outside and smoked a cigarette on the porch. He returned inside, watched TV in his bedroom, turned his fan on high, and fell asleep around 2:30 a.m.

Kevin awoke around 7:50 the next morning when Tyler came into his room and told him that Riley was gone. The kids often played hide-and-seek, so Kevin didn't panic. He went to the living room, where he saw Riley's blanket still on the couch and the front door open (he assumed Tyler opened it looking for Riley). He started calling Riley's name and looked carefully in her room, which was overrun with toys and had ample hiding spots. After searching the bedroom, he spent several more minutes searching the children's toy room. He then went back to the living room and kitchen and looked out the back window to see if she was in the backyard. She wasn't. After about 15 minutes, his sense of alarm growing, Kevin started walking to his neighbor's house,

but he decided it was too early to ring the doorbell. Instead, he returned home and called the neighbor on the telephone. They hadn't seen Riley. Kevin started to panic now and began a more urgent search of the house. About 40 minutes after Tyler woke him up, Kevin called the police. He called 411 instead of 911 because he knew he would get the police through 411, and he thought 911 was for extreme emergencies. At that point, he was telling himself that Riley was hiding and would eventually be found.

The dispatcher who received Kevin's 411 call was a local police officer who said, "Are you kidding me?" when Kevin told him that Riley was missing. The officer drove to the Fox residence, where he joined Kevin in searching the house. Soon other police officers started to arrive, and they told Kevin to wait outside. Word of the situation got out fast, and Melissa's and Kevin's family members started to arrive. A police officer told Kevin not to call Melissa and worry her, so he didn't. Instead, he began walking around the neighborhood, calling Riley's name. While he was out walking, Melissa called Kevin, who was carrying his cell phone. He started crying and told Melissa that Riley was missing. Melissa, who at the time was on a street in Chicago with her friends and hundreds of other walkers, collapsed at the news. Her friend picked up the phone and arranged to get Melissa to Wilmington as quickly as possible. On the way home, Melissa spoke with her younger brother, Michael, who was confused and told her that he thought the kids were still at the Rossis' house.

When Melissa arrived back in Wilmington the area was overrun with police and neighbors who were helping with the search. She found Kevin in the yard across the street from their house, and police officers heard her say to him, "Did you do something stupid?" and "You better not be lying to me." Melissa testified that she said those things because there was so much confusion about where Riley might be and she thought Kevin might have caused a false alarm. She testified that Kevin had not always been truthful with her and that she thought he might not be forthcoming with information that he knew would be painful for her to hear.

The police activated an "Amber Alert" around 2:30 that afternoon, but not long after they did, searchers found Riley's body floating in a creek in a nearby forest preserve. No one told the Foxes. Instead, police officers asked them to come to the Wilmington police station to be interviewed about Riley's disappearance; the Foxes did so willingly. At the station, officers separated the couple and questioned them independently. They questioned Melissa mostly about Kevin. After about an hour, Kevin and Melissa were reunited. By that point, officers had informed Kevin's father that Riley's body was found, and they asked him to break the news to Kevin and Melissa. When he did, Kevin collapsed, then started screaming and hitting the walls. The police did not tell the family that Riley had been sexually assaulted or that her body had been found with duct tape over the mouth and arms.

The next day the Foxes returned to the police station, where they allowed the police to take their fingerprints

and to collect their DNA. They also were introduced to Scott Swearengen, a Will County detective who was assigned as the lead investigator on the case. Although the Foxes didn't know it at the time, from the moment he saw Riley's body floating in the creek, Swearengen theorized that her death was an accident covered up to look like a murder by someone who knew her. But he told the Foxes that he was focusing on a theory that the murder was committed as an act of revenge by someone who might have been upset with them. Because no one told them about the sexual assault, the Foxes did not question his stated approach.

On June 22, 2004, 16 days after Riley's body was discovered, Swearengen asked the Foxes to take Tyler to a facility that he said offered free counseling. At the facility they met with Mary Jane Pluth, who introduced herself as a counselor and sought the Foxes' permission to ask Tyler if he woke up at all on the night of Riley's disappearance. They gave their permission and Kevin signed a consent form, which he did not read. If he had, he would have learned that Pluth's plan was to conduct a videotaped victim sensitive interview (VSI), which Swearengen and another Will County detective, Brad Wachtl, would watch from another room. The goal of a VSI is to extract helpful information from a vulnerable witness to assist in a criminal investigation.

The jury was allowed to watch the video of Tyler's VSI. The video shows that Pluth asked Tyler more than 20 times and in myriad ways whether Kevin had left the house on the night of Riley's disappearance. Tyler an-

swered "no" repetitively, although he became more and more upset and withdrawn over the course of the interview and ended up giving some answers that were equivocal and contradictory. The video ends with six-year-old Tyler crying and asking for his parents. An expert witness called by the Foxes testified at trial that no useful information could be gained from that interview, and Pluth conceded as much at trial.

Little happened in the investigation during the remainder of the summer, but several things happened in September 2004 that made the Foxes doubt Swearengen's handling of the case. For one thing, Melissa testified that she learned from a friend that a child was abducted from her home in LaPorte, Indiana, on September 12. An abduction from the home, of course, was what the Foxes thought had happened to Riley. Melissa reported the matter to Swearengen and asked him to look into it. She was surprised he hadn't learned of it himself and didn't think he showed a lot of interest in investigating if there was a potential connection. Next, a friend told Melissa that they had seen police driving the Foxes' Ford Escape—which the Foxes had traded in after the murder because it reminded them of Riley—past a Mobil gas station. Later, Melissa would learn that the detectives had identified a sport utility vehicle (SUV) on the Mobil station's surveillance video at two points in the early morning hours of Riley's disappearance. They were driving the Foxes' SUV past the station to see if they could match it to the car on the tape. Finally, someone tipped off Kevin to a rumor that Riley had been killed as part of a motorcycle gang initiation, and when he called

Swearengen to tell him, he found the detective's response disappointing. Swearengen sent Ruettiger to get more details from Kevin about the tip, but no one ever followed up on the lead.

The Foxes' doubts were abated for a brief moment around 7 p.m. on October 26, 2004, when Swearengen called and asked them to come down to the station to talk about a break in the case. Kevin and Melissa were excited; they drove to the station thinking they were about to learn what had happened to Riley. Their hope dissolved shortly after they arrived. They were led through three locked doors and then introduced for the first time to Ed Hayes, a supervisor recently assigned to Riley's case. Following the introduction the Foxes were separated; Melissa was taken to a waiting area and told that Guilfoyle would be right with her, and Swearengen and Wachtl took Kevin to an interrogation room. Unbeknownst to Kevin, some 30 other officers were watching the interrogation room by video monitor.

After giving *Miranda* warnings, Swearengen asked Kevin if he killed Riley or if he knew who did, and when Kevin said "no," Swearengen began questioning him again. Kevin repeated his story about what happened on the night of Riley's disappearance, and according to Kevin, its details were the same as the story he gave them on the night of her death. Around 8:10 p.m., about an hour after he arrived at the station, Swearengen accused Kevin of killing Riley. Kevin was outraged; he started crying, jumped from his seat, yelled that he would never do that, and tried to push his way past

the officers to leave. Wachtl intervened and told him to "sit your ass down." Kevin did so. Swearengen and Wachtl started yelling that they knew Kevin killed Riley, and told him (falsely) that they had fiber evidence implicating him. Every time he tried to deny it, the officers cut him off. Kevin asked to see a lawyer and Swearengen and Wachtl left the room, locking the door behind them.

A few minutes later Swearengen returned, this time with Hayes. Swearengen told Kevin that they had a surveillance tape from the Mobil station showing his SUV driving past it at 4:50 on the morning of Riley's death. Kevin knew that couldn't be true and denied it. Swearengen then suggested it would be better for Kevin if the whole thing had been an accident, and that if it were, Kevin would be charged only with involuntary manslaughter. Hayes told him that if it wasn't an accident Kevin would spend 30 years to life in prison. Hayes kept saying that he knew Kevin would fail a polygraph, so Kevin volunteered to take one.

Meanwhile, back in the waiting room, Melissa grew impatient when three hours passed and Guilfoyle didn't appear as promised. She began kicking on the locked door and yelling for someone to come and talk to her. Around 11 p.m., Swearengen appeared and took her to an office where Wachtl was waiting. They told her that they thought Kevin killed Riley. They told Melissa, for the first time, that Riley had been sexually assaulted. They said they thought Kevin killed Riley by accident and then tried to make it look like the motive was sexual assault. Melissa didn't buy this story, even for an in-

stant. At about midnight, officers brought a pale, drained Kevin to the office where Melissa was sitting, and he told her he was going to take a polygraph test so they could go home.

Around 1:30 a.m., Kevin took a polygraph examination, and the examiner immediately told him that the results showed he was not being truthful. (At trial, an expert witness testified that the polygraph results were fabricated.) Kevin could not believe it. Officers brought Melissa into the polygraph room, and the polygraph examiner told her Kevin had failed. Melissa turned to Kevin, told him she loved him, that she believed him, and that she was behind him all the way.

According to the Foxes, Hayes was outside the door when Melissa made those comments, and as soon as she did, he went ballistic. He screamed to the officers to "get her the fuck out of that room right now," and a detective started pulling Melissa out of the room by the arm while Hayes screamed "you're a fucking murderer" at Kevin. Hayes then met Melissa in the doorway and screamed in her face, "Your husband's a fucking liar, and he's a fucking murderer. He never loved you or your fucking daughter, and he killed her, and you need to learn to fucking get over it." Melissa said that she was terrified and felt like Hayes had "crushed the spirit out of her."

Kevin testified that at this point he was falling apart because he could not believe he failed the polygraph or that Hayes had spoken to his wife as he did. Back in the interrogation room, Hayes told Kevin that if he did not admit to killing Riley, he would fill out the arrest form

for first-degree murder. Hayes then said that he knew people in prison and would make sure that other inmates raped Kevin every day. He started filling out the arrest form for first-degree murder, while Guilfoyle started banging handcuffs on the table in front of him, screaming at him, and calling him a "pussy." Hayes repeated the rape threat several times and led Kevin to believe he was being charged with first-degree murder.

Hayes and Guilfoyle left the room and Ruettiger and another detective, David Dobrowski, entered. Kevin was crying, and Dobrowski started rubbing his back in a way Kevin perceived as sexually threatening. Ruettiger, who was sitting opposite Kevin, told him that his story was "bullshit" and tried to degrade him by moving his chair closer and closer until Ruettiger's testicles were pushed against Kevin's knee. Kevin interpreted this as a message that the rape threats were real. Ruettiger told Kevin that his family had abandoned him and that Melissa would marry someone else who would raise Tyler. Kevin continued to deny any involvement in Riley's death.

Dobrowski and Ruettiger left the room and Guilfoyle returned with a pink ribbon magnet reading "Riley in our Heart." Guilfoyle threw the magnet on the table in front of Kevin and yelled that Riley was on her knees begging Kevin to admit what he did and give her closure. Guilfoyle left, and some time later Hayes and Swearengen returned. Hayes was holding a stack of photos, and he showed Kevin a crime scene photograph of Riley's body in full rigor mortis. This is how Kevin learned that she had been duct-taped. Swearengen was out of breath and

excited and told Kevin that he had just learned that the state's attorney would give Kevin a deal if he said there had been an accident. He said if Kevin admitted to an accident he would bond out the next day and would serve only three to five years in prison.

At this point Kevin said he felt he had to go along with the accident story. He thought if he did, he could go home the next day and clear his name. Swearengen began proposing accident scenarios to Kevin. He asked if Riley fell off the couch and Kevin said no. He proposed another story that Kevin denied, and Swearengen told him he had to come up with something. Kevin decided he would agree to an implausible accident story so that when he got out he could prove that it was all a lie. He decided to tell the officers he accidentally hit Riley with the bathroom door because he knew it was impossible to hurt her severely that way; the bathroom door was hollow. He also told the officers that when he hit her with the door she fell and hit her head on the bathtub—another impossibility, according to Kevin, because the bathtub was several feet from the door. Swearengen told Kevin he had to say that he thought that Riley was dead but that she was actually unconscious; they needed a way to explain how she drowned. The officers had not found Riley's underwear, and they asked Kevin where it was. He replied that it was in the creek, but the officers told him he couldn't say that (they had searched the creek unsuccessfully). Kevin told the officers that he drove Riley's body to the creek and then drove home on a specific route. He told them he threw the duct tape away in a store dumpster that was not on the

route he gave them, knowing that the detail would not check out. He said he went home and left the front and back doors open and went to sleep. Kevin said that he gave the answers the officers wanted to hear because he thought that was the only way he was going to get them to stop threatening him.

Later that morning, Kevin was taken to the Will County jail where he met with a lawyer. He immediately renounced his "confession." He told her what happened during the interrogation, and the next day a press release was published explaining those details.

Shortly after Kevin was jailed, Hayes called the FBI and told them to stop testing the DNA evidence on Riley's case. Eight months later, the defense team finally got the DNA evidence to a private lab, which tested it within days. The results showed with 100 percent certainty that Kevin was not the donor of the DNA found on a vaginal swab and on the duct tape on Riley's mouth. On June 17, 2005, the day after the DNA test results were released, the prosecutor dropped the charges and Kevin was released from custody. He had spent 243 days in jail.

Following the verdicts in favor of the Foxes, the defendants moved for a new trial or judgment as a matter of law under Federal Rule of Civil Procedure 50(b), for a new trial under Rule 59(a), and to alter or amend the judgment under Rule 59(e), arguing that the trial was tainted by erroneous evidentiary rulings and jury instructions. They also argued that they were entitled to judgment as a matter of law on the constitutional and emotional distress claims and that the damages awards

were excessive. The district court denied the motions except that it threw out the punitive damages awarded to Melissa and part of the punitive damages awarded to Kevin, leaving a $12.9 million judgment intact. (After Ruettiger's estate satisfied the judgment against it, $12.2 million remained.) The defendants appeal, arguing that they are entitled to reversal on all counts or, in the alternative, a new trial.[1]

The defendants' central argument on appeal is that they had probable cause to arrest Kevin and, accordingly, that they are entitled to qualified immunity on all but Melissa's IIED claim.[2] *See, e.g., Pierson v. Ray*, 386 U.S. 547, 555 (1967); *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006). According to the Foxes, the defendants waived this argument by neglecting to present it—in the exact form in which it appears on appeal—to the district court. While it is true that some of the nuances of the defendants' argument on appeal differ from their stance before the district court, it is clear that the defendants consistently presented the heart of their qualified immunity argument throughout the proceedings. Waiver is not meant

---

[1] After the defendants assigned to the Foxes their rights under insurance policies issued by American Alternative Insurance Corporation and Essex Insurance Company, the insurers intervened in this appeal. The insurers submitted briefs arguing that the verdicts are fatally inconsistent and that punitive damages are unwarranted.

[2] Melissa's IIED claim does not stem from Kevin's arrest or prosecution, but rather from Hayes's treatment of Melissa on the night of the interrogation.

as an overly technical appellate hurdle, *see, e.g., Nolen v. Sullivan*, 939 F.2d 516, 518-19 (7th Cir. 1991), and because the defendants' qualified immunity argument was fairly presented throughout the dispositive pre- and post-trial motions, we will review it here.

In sorting out the question of qualified immunity, we must ask whether the facts—again, taken in the light most favorable to the Foxes—show that the officers' conduct violated Kevin's clearly established constitutional rights. *See Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009); *Newsome v. McCabe*, 319 F.3d 301, 303-04 (7th Cir. 2003). It is well-established that an arrest without probable cause violates the Fourth Amendment, *see Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), so the question is whether the evidence supports the jury's finding that the officers arrested Kevin without probable cause.

To answer this question we must identify the earliest time at which the jury reasonably could have found that Kevin was under arrest. *See United States v. Reed*, 443 F.3d 600, 602-03 (7th Cir. 2006). An arrest occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Tyler*, 512 F.3d 405, 409-10 (7th Cir. 2008) (citations omitted). The Foxes contend that the arrest occurred soon after they arrived at the station, around 8:10 p.m. That is the moment just after Swearengen and Wachtl accused Kevin of killing Riley when Kevin stood up and tried to leave but was told by Wachtl to sit his "ass down."

The defendants argue that Kevin was not under arrest at this point because he did not ask the officers if he could leave. *See Hall v. Bates*, 508 F.3d 854, 857 (7th Cir. 2007). But whether a person asks permission to leave is but one factor among many in the arrest analysis. The other factors include whether the police inform a person that he is suspected of a crime, whether the person's movement is limited, whether the officers engage in coercive conduct suggesting that cooperation is required, and whether the person is in a private location. *Tyler*, 512 F.3d at 410. The majority of the relevant arrest factors fall in Kevin's favor. At the moment in question, Swearengen and Wachtl accused Kevin of killing Riley. Kevin attempted to leave the interrogation room, but Wachtl prevented him from doing so in no uncertain terms. Under these circumstances, a reasonable person certainly would not think himself free to leave. Actions do speak louder than words. Here, Kevin tried to leave the room and was blocked; he was not required to reiterate his request verbally to establish his seizure for Fourth Amendment purposes. Accordingly, a reasonable jury could conclude that Kevin was arrested at 8:10 p.m., early on during what was to be a very long night of interrogation.

Next, we must determine whether a reasonable jury could find that at the moment of Kevin's arrest the officers lacked probable cause. Answering this question requires a close look at the facts of this case, a task made more difficult by the parties' often widely divergent accounts of the underlying events. Part of this divergence, it seems, can be chalked up to the collision

of two basic principles. On the one hand, it does not take much to establish probable cause. The officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false. *Woods v. City of Chi.*, 234 F.3d 979, 996 (7th Cir. 2000). And this standard is made even more forgiving in the context of qualified immunity, which "applies not only to those officials who correctly determine that probable cause to arrest exists, but also to those governmental officials who reasonably but mistakenly conclude that it does." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). Mindful of the tall task confronted by police investigators, we make this determination based on "the facts as they would have reasonably appeared to the arresting officer seeing what he saw, hearing what he heard . . . ." *Driebel v. City of Milwaukee*, 298 F.3d 622, 643 (7th Cir. 2002) (internal quotation marks omitted). On the other hand, however, the probable cause standard does not trump our duty to defer to a jury's findings. *Newsome*, 319 F.3d at 303-04. "Claims of qualified immunity neither require nor authorize *de novo* appellate review of the evidence." *Id.* at 303. Instead, we make all reasonable credibility determinations and inferences in favor of the Foxes, asking whether under their version of the facts a reasonable officer could conclude that there was probable cause to arrest Kevin on October 26, 2004, at 8:10 p.m. *See id.*; *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1014 (7th Cir. 2006).

The defendants present a laundry list of facts (three pages of bullet points in their opening brief) that they

believe support a probable cause finding. Their list suffers from many shortcomings, the most serious being that it is comprised largely of disputed facts. The defendants appear to interpret the relatively lenient probable cause standard as license to rely on their version of the events, but, as we have just explained, at this stage it is the Foxes' version that carries the day. *Newsome*, 319 F.3d at 303. It is true that probable cause is determined from the perspective of what the officers knew at the time of the arrest, but that does not mean that the jury was compelled to believe the officers' testimony in reaching a probable cause determination.

For example, the defendants cite as a factor in the probable cause analysis Swearengen's testimony that Kevin was suspiciously unemotional during an interview on the day Riley disappeared. But the testimony was inconsistent—Swearengen admitted that Kevin cried during that same interview, and a cavalcade of other witnesses confirmed that Kevin was distraught throughout the day. Although it is true that an inappropriately flat emotional state *could* raise an officer's suspicions, the jury did not have to credit Swearengen's testimony that Kevin was strangely stoic that day.

The defendants rely on disputed facts for another somewhat bizarre factor in their probable cause analysis; they contend that the officers reasonably believed that Riley's injuries "were not consistent with a sexual predator having killed and sexually assaulted her," thus supporting their theory that Kevin was involved. Swearengen and Sergeant Michael Markowski,

who attended the autopsy, testified that the pathologist stated that Riley's sexual injuries were minor. The defendants argue that Riley's "minor" injuries, together with the relatively small amount of duct tape found on the body and what they say are a lack of defensive wounds, were inconsistent with the involvement of a sexual predator because, according to them, the trauma was insufficiently brutal. But at trial the pathologist flatly denied ever characterizing Riley's sexual injuries as minor. He testified that her injuries would have been severe for an adult woman and were absolutely at the top of the scale for a small child. The autopsy also revealed wounds on Riley's legs and head which, according to another expert, were defensive. Given this testimony, the jury did not have to believe the officers when they testified that they thought the injuries were "minor." And even absent the conflict, probable cause must rest on reasonable belief, *see Phelan v. Vill. of Lyons*, 531 F.3d 484, 489 (7th Cir. 2008), and here the officers' theory is absolutely unreasonable. The officers knew that Riley, a three-year-old child, had lacerations and bruises in her vagina, that she had been bound with duct tape, and then, following the sexual assault, left for dead in the creek. Under those circumstances it was unreasonable for them to rule out a sexual predator as her attacker. Probable cause may be a loose concept, but it leaves no room for the absurd.

Nor does the probable cause standard allow the defendants to rely on facts without regard to the full context of the circumstances known to them. *Guzell v. Hiller*, 223 F.3d 518, 520 (7th Cir. 2000) (noting that police

"can't close their eyes" to information that undercuts probable cause). Here, the defendants highlight as a probable cause factor Kevin's statement that he locked the front door before going to bed, when the next morning the front door was open with no sign of forced entry. Standing alone, this would suggest an inside job. But that inference is reasonable only if we ignore other facts known to the officers at the time of the arrest: specifically, that the back door to the Fox house did not lock, so an intruder would not need to force entry to get inside. Under these circumstances, the lack of a forced entry is irrelevant.

The defendants also rely on Tyler's videotaped VSI, noting that at one point in the interview Tyler said that he saw his father leave the house after they returned home. They argue that this statement gave them probable cause to think that Kevin left the house to dispose of Riley's body. But the defendants fail to mention (until their reply brief) the fact that during the VSI Tyler repeatedly and consistently stated that Kevin left *without* Riley and that she remained sleeping while he was outside. Kevin already had explained that he went outside to smoke a cigarette after putting the kids to sleep. Thus, Tyler's VSI statement would add no fuel to a reasonable officer's suspicion.

In addition to relying on disputed facts and taking others out of context, the defendants point to many facts that are simply irrelevant to the probable cause analysis. For example, the defendants note that FBI statistics show that 60 percent of murdered children under

the age of five were killed by their parents. But this statistic is unmoored from the facts of this case—both the defendants and the plaintiffs presented expert witnesses who stated that the statistic's percentage is greatly reduced when the murder is coupled with a sexual assault. The defendants also rely on Kevin's history of occasional cocaine use as a probable cause factor. The judge excluded that evidence as unduly prejudicial, but even had it come in, his past drug use would not undermine the jury's verdict. There is no suggestion that Kevin was impaired by drugs on the night of Riley's death, and the defendants fail to explain how his cocaine use months prior to Riley's death could add anything to a reasonable officer's suspicion that he killed his own daughter. The same goes for Kevin's statement that he was "pissed" when he learned that Riley's body had been found. What rational person would not be angry when told that their child had been murdered, and in any event, even Swearengen testified that this statement is insignificant in the probable cause calculus.

After factoring out the fluff—the disputed, mischaracterized, and irrelevant facts—the defendants' argument rests on the following: Kevin (1) was the last known adult to be with Riley; (2) looked for Riley for 40 minutes before reporting her disappearance to a nonemergency number; (3) did not call Melissa immediately upon discovering that Riley was gone; (4) did not reveal that he watched an adult video the night that Riley disappeared until the night of his interrogation months later, and (5) a vehicle that could have been Kevin's Ford Escape

appeared on a gas station's surveillance video during a time when Kevin said he was asleep and in the general timeframe of Riley's disappearance. Although of course the officers did not need anything close to an airtight case before they arrested Kevin, they needed concrete facts sufficient to elevate their hunch that he was involved in Riley's death to a reasonable belief. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Here, the facts, when taken in the light most favorable to the Foxes, fall short.

The defendants place particular weight on Kevin's late admission that he watched an adult video before going to sleep on the night of Riley's death, and they have several theories regarding its importance. First, they contend that although Kevin told them from day one that he had watched TV that night, he did not specify that he had watched an adult video until the evening of his interrogation. According to the defendants, this " new" revelation showed that he originally had lied to them about his behavior. Obviously false and inconsistent explanations can lend support to a probable cause finding, *see United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999), especially when they go to a material fact in the case, *see Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir. 1996). But what we have here is the omission of a detail, not a lie about a material fact. Without more, a reasonable officer would probably conclude from the "new" information that Kevin omitted the detail of what he watched because it was irrelevant and, perhaps, because it was embarrassing.

The defendants try to jack up the significance of this detail by claiming that on the day of Riley's death Kevin told police that he could not remember what he watched on TV that night, so his admission on the night of the interrogation represented not just new information but an actual change in his story. But at trial the only officer who testified that Kevin originally said he could not remember what he watched was Markowski, who was not involved in the interrogation or Kevin's arrest. None of the defendants testified that they knew at the time of the arrest that Kevin originally had said he could not remember what he watched, and in fact Swearengen admitted that he did *not* know about the supposed change in story at the moment of arrest.[3] Because at trial the defendants did not show that the "change" was a circumstance known to them at the time of the arrest, they cannot point to it as a factor in their probable cause analysis. *See Holmes*, 511 F.3d at 679 (noting that probable cause turns on conclusions reasonable officer could make from information known at time of arrest); *Booker*, 94 F.3d at 1058 (same). And in any event, Kevin testified that he did not change his story on the night of his interrogation. The jury simply could have found Kevin more credible than Markowski.

The defendants also argue that Kevin's admission regarding the adult video raised a red flag for them

---

[3] The defendants do not argue that Markowski's knowledge of Kevin's original statement should be imputed to them. *See, e.g.*, *United States v. Parra*, 402 F.3d 752, 764-66 (7th Cir. 2005) (discussing collective knowledge doctrine).

because it added a sexual element to his behavior, which they considered relevant given the sexual assault. In addition to admitting that he watched pornography, Kevin told the officers that he had felt "horny" that evening and had masturbated into a condom. The district court excluded these added details as unduly prejudicial, a ruling that the defendants now challenge on the ground that Kevin's sexual mood was an important factor in their probable cause determination. But even the defendants' own expert witness explained in his offer of proof what should have been obvious to any reasonable police officer:  that just "because a man watches adult pornography and masturbates," does not mean that "he is likely to sexually molest his three-year-old daughter." We do not second-guess the judgment of the officers lightly, but courts have an obligation to ensure that the reasons supporting an arrest are objectively reasonable. *See Devenpeck*, 543 U.S. at 152-53; *Sornberger*, 434 F.3d at 1014-15. To the extent they ask us to conclude that Kevin's admission to watching an adult video and masturbating lends support to their decision to arrest him for killing his daughter, that suggestion strays beyond the boundaries of reasonableness.

The defendants' last-ditch effort to salvage some relevance out of the masturbation admission is their assertion that Kevin's use of a condom reasonably heightened their suspicion. Specifically, they say that the defendants thought that Kevin mentioned this detail as a "preemptive strike," maybe thinking that they had found a condom at the scene that needed to be explained away. Perhaps that assertion would make a sliver of sense if they

actually had found a condom in the house, but they hadn't. More importantly, this spin on his assertion is utterly inconsistent with the officer's stated theory that Kevin accidentally killed Riley and then staged a sexual assault using a finger or a pencil. In any event, this kind of speculation adds no weight to the defendants' probable cause analysis. *See United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004) (noting that officer speculation is insufficient to establish probable cause); *Sherouse v. Ratchner*, 573 F.3d 1055, 1062 (10th Cir. 2009) ("Where an officer observes inherently innocuous behavior that has plausible innocent explanations, it takes more than speculation or mere possibility to give rise to probable cause to arrest.").

Even fully crediting the remaining facts to which the defendants point, a reasonable jury could conclude that the defendants lacked probable cause. Kevin's somewhat disorganized 40-minute search for Riley is not so unusual to reasonably suggest that he was involved in her death. Nor is the fact that he did not call Melissa right away or that he called 411 instead of 911 in a small town where the same police dispatcher answers both lines. The grainy Mobil surveillance video lends only an ounce of support to the officers' theory. The video did not conclusively show Kevin's car, but only a car that *could* have been a Ford Escape. In fact, an officer brought in specifically to examine the tape could not even be sure that the vehicle was a Ford Escape instead of any other brand and model of SUV. After considering that exceedingly weak evidence along with the other undisputed facts known to the officers at the time of

Kevin's arrest, we find no reason to disturb the jury's conclusion that the defendants lacked probable cause to arrest him in connection with Riley's death.

The defendants make one final effort to support their claim of qualified immunity: they argue that even if they did not have probable cause to arrest Kevin for Riley's murder, they did have probable cause to arrest him for other crimes. They correctly point out that an arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that *some* criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect. *See Devenpeck*, 543 U.S. at 153-56. They argue that the district court erred when it failed to instruct the jury on this point of law, and they assert that if it had, the jury could have found that the defendants had probable cause to arrest Kevin for attempted battery, aggravated assault, or obstruction of justice. Specifically, they point out that when Swearengen accused him of killing Riley, Kevin stood up and said "if you accuse me one more time, I am going to punch you," right before he attempted to leave and Wachtl told him to "sit [his] ass down." Accordingly, they argue that they had probable cause at that moment to arrest him for attempted battery or aggravated assault. Alternatively, they argue that when Kevin said that he watched an adult video they had probable cause to arrest him for obstructing justice.

The Foxes contend that the defendants waived this argument by failing to present it below, and here they have a point. To preserve their objection to the district

court's decision not to give a *Devenpeck* instruction, the defendants were required to object on the record in a timely fashion and to make an argument in support of the proposed instruction. *See* Fed. R. Civ. P. 51(c); *Consumer Prods. Research & Design v. Jensen*, 572 F.3d 436, 439 (7th Cir. 2009). But the defendants did not ask for a *Devenpeck* jury instruction, on the record, during the jury instruction conference. Also, they never explained to the judge their theory that they had probable cause to arrest Kevin for one of the crimes they now cite, nor did they ask for an instruction informing the jury of the elements of those crimes. In fact, the only point in the record that the defendants cite to show that they developed the assault or obstruction of justice theories in the district court was in a reply brief to their motion for a new trial. But by then it was too late for them to develop a new theory. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009).

In any event, even if the defendants had preserved the *Devenpeck* component of their probable cause argument, the evidence does not support their contention that they had probable cause to arrest Kevin for any of the crimes they now name. There is no evidence suggesting that Kevin's statement to Swearengen was accompanied by a threatening gesture, such as a raised fist, and both Wachtl and Swearengen (the only officers in the room at the time) testified that they did not believe that Kevin was actually threatening Swearengen. Given the utter failure of Kevin's statement to provoke in the officers the slightest apprehension of a battery, no reasonable jury could have found that the circumstances

known to the officers gave them probable cause to arrest him for attempted battery or aggravated assault. *See* 720 ILCS 5/12-1, 5/12-2(a)(6), 5/12-3; *Kijonka v. Seitzinger*, 363 F.3d 645, 647-48 (7th Cir. 2004).

Similarly, because none of the officers were aware of Markowski's story that Kevin originally said he could not remember what he watched on TV the night Riley was taken, that statement could not have given them probable cause to arrest Kevin for obstruction of justice. Probable cause is determined from the facts known to the officers at the time of the arrest, *see Holmes*, 511 F.3d at 679, and no evidence showed that at the moment of his arrest any of the defendants had reason to believe that Kevin had knowingly given them false information, *see* 720 ILCS 5/31-4(a). Accordingly, they did not have probable cause for an arrest based on obstruction of justice.

Next, the defendants argue that they are entitled to a new trial because, they say, the district court committed numerous evidentiary errors that undermined their ability to establish probable cause. We review the district court's evidentiary rulings only for abuse of discretion. *Hollins v. City of Milwaukee*, 574 F.3d 822, 828 (7th Cir. 2009). First, as we have noted, the defendants argue that the court abused its discretion in excluding evidence that Kevin told the officers before his arrest that he was "horny" on the night of Riley's disappearance and that he had masturbated into a condom while watching an adult video. The defendants argue that this evidence was relevant to show that Kevin had changed his story about not being able to remember what he watched that

night. Even putting aside the defendants' testimony that they did *not* know about the supposed change, the court allowed them to elicit testimony that Kevin watched an adult video. That was the only fact they needed to demonstrate the supposed change. The defendants complain that without the "horny" comment and masturbation details, the change in story loses its "dramatic" effect. But here, "dramatic" might just as well stand in for "prejudicial." A district judge, at the controls of an emotional, gut-wrenching trial like this, is in a far better position than appellate judges to weigh the competing factors that go into a probative value versus unduly prejudicial calculus. A trial judge's call on these types of issues can only be upset if we are convinced that the judge has clearly abused the wide discretion he enjoys. *See* Fed. R. Evid. 403; *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 441 (7th Cir. 2009) (noting district court afforded special deference in determining whether evidence unduly prejudicial). We cannot say the judge abused his discretion when he decided to keep these "dramatic" details from the jury.

The defendants also argue that the district court erred in excluding evidence that Melissa told them on the day Riley's body was found that Kevin had a history of lying about his cocaine use months prior to the events underlying this case. But to the extent that this history is relevant to the defendants' probable cause analysis, the court allowed them to submit evidence that Melissa said that Kevin had a history of lying, it just prohibited them from showing that the lies were about drug use. Thus, once again the defendants were allowed to present the core fact underlying their probable cause

analysis but now complain that it packed an insufficient wallop with the jury because they were not permitted to advance the (obviously prejudicial and barely proba-tive) details. That is not enough to show that the district court abused its discretion. *Cf. Kunz v. DeFelice*, 538 F.3d 667, 677 (7th Cir. 2008) (noting witness's history of drug use relevant only if goes to inability to recall or relate events). Nor are we convinced that Kevin's drug use is relevant to Melissa's loss-of-consortium claim. The defendants point to no evidence that after Riley's death the marriage was at risk because of Kevin's prior drug use, and to the extent it would show that they had prob-lems earlier (and both Kevin and Melissa testified that they had what they considered typical marital problems), again the district court did not abuse its discretion in concluding that its probative value was outweighed by its prejudicial effect. *See Lewis*, 590 F.3d at 441.

Next, the defendants argue that they were prevented from establishing probable cause because the district court granted the Foxes' motion in limine to exclude testimony regarding any advice that an FBI profiler, Special Agent Dale Moreau, gave the defendants during a conference call between him and several of the defen-dants nine days after Riley's death. The defendants assert that the testimony would have shown that Moreau told the defendants they were on the right track in focusing on Kevin as a suspect. But the defendants never really argued to the district court that the testi-mony was relevant to the probable cause analysis. It wasn't. The FBI profiler did not say that any of the evi-dence they collected amounted to probable cause;

instead, he simply told them it was reasonable to keep investigating Kevin to see if they could come up with probable cause. The only argument defense counsel made to the district court with respect to relevancy was an assertion that the testimony "goes to explain their course of conduct or their behavior." They go to much greater lengths in their briefs on appeal to explain what that means, but they did not develop the argument before the district judge. Accordingly, we do not find that the district court abused its discretion in excluding this testimony.

Finally (with respect to the evidentiary arguments, that is) the defendants argue that the district court erroneously excluded the videotape memorializing Kevin's "confession." The video was the subject of repeated and prolonged side bars during which the defendants argued that it demonstrates that they had probable cause to arrest Kevin. That argument goes out the window with our conclusion that a reasonable jury could have found that the arrest occurred shortly after 8 p.m., 11 hours before the video was made. Recognizing that limitation, on appeal the defendants focus on an argument that they raised below, if only cursorily: that the video is relevant to Kevin's malicious prosecution and IIED claims.[4] The

---

[4] We note that the defendants also argue that it was prejudicial for the district court to exclude the video memorializing the end of the interrogation while allowing the Foxes to present staged photographs reenacting their version of the interrogation. In those photos the Foxes play themselves and actors
(continued...)

defendants argue that viewing the video would have helped the jury decide whether the defendants coerced his confession and whether he was showing signs of severe distress immediately following the alleged coercion. But there are no allegations of physical harm that the video could verify, and all of the allegations of coercion stem from events leading up to the video—events that the defendants chose not to record. Most importantly, the video represents just 23 of the 870 minutes or so of Kevin's interrogation, and thus cannot provide a complete picture of either the interrogation itself or Kevin's level of distress. Under those circumstances, we cannot say that the court abused its discretion in concluding that the video's prejudicial effect and potential for confusing the jury outweighed its probative value with respect to the issue of coercion or Kevin's demeanor following the interrogation.

Having resolved the probable cause and evidentiary controversies in favor of the Foxes, we turn to the defendants' argument that they are entitled to judgment as a matter of law on the Foxes' Fourteenth Amendment due process claim—a question we review de novo. *See Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445, 451 (7th Cir. 2009). The defendants argue that the due process

---

[4] (...continued)

play the defendants. At first blush, this struck us as a persuasive argument, but then we checked the record and learned that the defendants did not actually object when the court admitted the reenactment photos at trial. It's too late for them to complain now. *See Lewis*, 590 F.3d at 444.

verdict cannot stand because Kevin's malicious prosecution claim provides an adequate remedy for the conduct underlying the § 1983 due process claim, and thus cancels out the constitutional tort. *See Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009); *McCullah v. Gadert*, 344 F.3d 655, 658-59 (7th Cir. 2003). The Foxes argue that the defendants waived this argument by not raising it below, but once again their version of waiver slices the salami a smidge too thin. The defendants pressed the precise argument they raise on appeal in their summary judgment motion and in their Rule 59(e) motion and incorporated it by reference into their Rule 50(b) motion for judgment as a matter of law. They also moved for a directed verdict on the due process claim based on a more general argument that the allegedly coercive interrogation and police misconduct did not amount to a due process violation. They pressed the general argument again in their Rule 50(b) motion for judgment as a matter of law. Because the defendants presented their due process argument to the district court before the entry of judgment, we think the argument is preserved. *See Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1336-37 (7th Cir. 1992).

Turning to the merits, the defendants gain some traction with their argument that the Foxes' state law remedies knock out their substantive due process claim. *See Brooks*, 564 F.3d at 833; *McCullah*, 344 F.3d at 658-59. The Supreme Court has long counseled against shoe-horning into the more general protections of the Fourteenth Amendment claims for which another amendment provides more specific protection. *See United States v. Lanier*,

520 U.S. 259, 272 n.7 (1997); *Albright v. Oliver*, 510 U.S. 266, 273 (1994). It also has held, in a line of cases stemming from *Parratt v. Taylor*, 451 U.S. 527, 535-44 (1981), that a plaintiff cannot invoke the substantive due process clause where state laws provide an adequate postdeprivation remedy for the complained-of conduct. *See McCullah*, 344 F.3d at 658-59. But that is what the Foxes have done here. In their complaint, the Foxes allege that the defendants violated Kevin's due process rights when they "deliberately fabricated false statements and deliberately obstructed justice, thereby causing the false arrest of [Kevin], causing him to be falsely imprisoned [and] prosecuted . . . ." They also allege that the defendants "provided false allegations" and "withheld exculpatory evidence." Kevin's due process claim thus consists of nothing more than a hybrid of his Fourth Amendment false arrest and state law malicious prosecution claims, and accordingly, the due process claim is barred. *See Brooks*, 564 F.3d at 833; *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003).

Perhaps recognizing the strength of the defendants' argument, the Foxes now argue that Kevin's due process claim is not connected to the conduct underlying their other claims, but instead rests on their theory that what happened to Kevin during his interrogation "shocks the conscience." The Supreme Court has recognized that police conduct that "shocks the conscience" supports a due process claim under § 1983, *Rochin v. California*, 342 U.S. 165 (1952), and we have acknowledged that a free-standing due process claim may succeed in a situation involving conscience-shocking

interrogation tactics, *see Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006). There is no clear-cut analysis to determine what constitutes "conscience-shocking" conduct; the question is whether the conduct is "too close to the rack and the screw." *See Rochin*, 342 U.S. at 172. For example, on the one hand, forcing an emetic down a person's throat to forcibly extract evidence from a suspect's stomach shocks the conscience, *see id.*, but on the other hand, lying to, threatening, or insulting a suspect does not, *see Tinker v. Beasley*, 429 F.3d 1324, 1329 (11th Cir. 2005).

We need not wade into the murky terrain between those extremes to determine on which end of the spectrum the defendants' conduct falls, because the Foxes never presented to the jury their theory that the defendants' interrogation tactics shock the conscience. The jury was instructed that it should find for Kevin on his due process claim if (1) the defendants created false evidence or statements by means of coercion, manipulation, or fabrication, and (2) that those acts harmed Kevin. The jury simply was never instructed that the due process claim turns on the interrogation tactics nor that it must find those tactics shocking to the conscience in order to find for Kevin. The Foxes cannot now defend the due process verdict based on a theory that was never put before the jury. *See Staub*, 560 F.3d at 655-56; *United States v. Ienco*, 92 F.3d 564, 570 (7th Cir. 1996). Because the only due process theory presented to the jury fails as a matter of law, the verdict on that count must be set aside.

We disagree, however, with Hayes's contention that he is entitled to judgment as a matter of law on Melissa's

IIED claim. The evidence at trial showed that when Hayes heard Melissa offer support to Kevin following the polygraph, he became irate and screamed in her face, "Your husband's a fucking liar, and he's a fucking murderer. He never loved you or your fucking daughter, and he killed her, and you need to learn to fucking get over it." Melissa testified that in that moment she was terrified and that she felt like Hayes had "crushed the spirit out of her." The defendants argue that Hayes's conduct and Melissa's reaction are insufficient to support an IIED claim.

To prevail on her IIED claim under Illinois law Melissa had to prove (1) that Hayes's conduct was extreme and outrageous; (2) that Hayes knew that there was a high probability that his statement would cause Melissa severe emotional distress; and (3) that Hayes's comment in fact caused Melissa severe emotional distress. *See Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 20 (1992). We think that she has made a strong showing on the first two factors, and that the strength of those factors compensates for the weakness of the evidence with respect to the third. *See Honaker v. Smith*, 256 F.3d 477, 496 (7th Cir. 2001).

For conduct to be extreme and outrageous it must go "beyond all bounds of decency" and be "considered intolerable in a civilized community." *Lopez v. City of Chi.*, 464 F.3d 711, 721 (7th Cir. 2006) (citations omitted). An important factor in this analysis is whether a defendant abused a position of authority. *See Kolegas*, 154 Ill. 2d at 21 (citing *McGrath v. Fahey*, 126 Ill. 2d 78, 86-87

(1988)). "[T]he extreme and outrageous character of a defendant's conduct may arise, not so much from what he says or does, but from the defendant's improper use of a position of power which gives him the ability to adversely affect the plaintiff's interests." *Id.* at 22. What's more, the first and second factors bleed into each other because, as the Illinois Supreme Court has noted, "[b]ehavior that might otherwise be considered merely rude, abrasive or inconsiderate, may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to emotional distress." *Id.* at 21.

Here, we think Hayes's abuse of his authority, involving an obviously vulnerable mother and wife, boosts what otherwise might be characterized as a particularly ugly insult across the threshold into a valid IIED claim. At the moment he made the comment, Hayes was the supervisor in charge of Kevin's interrogation. He had Kevin under arrest and was threatening to charge him with Riley's murder. Essentially, at that moment, a jury could easily find that Hayes held Melissa's family life in the balance and he exploited his position of power to intentionally cause her distress. What's more, he knew that as the mother of a recently murdered child and the wife of the man accused, she was particularly susceptible to emotional distress. Although it is true that the evidence showed that Melissa's distress stemming from his comment may have been short-lived, the duration of distress is only one factor that must be weighed. *See Honaker*, 256 F.3d at 497. As we have noted, "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the

distress has existed." *Id.* at 496 (quoting Restatement of Torts, 2d). We think that this is such a case, and accordingly Hayes is not entitled to judgment as a matter of law on Melissa's IIED claim.

Next, we turn to the defendants' argument that they are entitled to a new trial based on what they characterize as prejudicial errors in the jury instructions. Our review of jury instructions is limited; we ask whether the instructions as a whole were sufficient to inform the jury of the applicable law. *Lasley v. Moss*, 500 F.3d 586, 589 (7th Cir. 2007). We will reverse only if an instruction so misled the jury that the deficiency prejudiced the defendants. *See Cruz v. Safford*, 579 F.3d 840, 843 (7th Cir. 2009).

First, the defendants argue that the district court erroneously refused to instruct the jury that it is impermissible to award duplicative damages. Specifically, they argue that the jury should have been instructed "to adjust damages based on the distinct injury suffered," because, according to the defendants, the claims for malicious prosecution, false arrest, and due process rested on the same conduct and gave rise to the same injuries. The district court refused the defendants' proposed instruction because it found that the jury form protected against the risk of duplicative damages by separating the claims and requiring the jury to award damages on each distinct claim.

As an initial matter, counsel for the defendants did not meet their obligation to explain to the district court why the verdict form was insufficient to protect against the

risk of duplicative damages. *See* Fed. R. Civ. P. 51(c); *Consumer Prods. Research & Design*, 572 F.3d at 438-39. But even if counsel had fully developed the argument, given our ruling that the due process claim cannot stand, the duplicative damages argument loses its teeth. Viewing the false arrest and malicious prosecution verdicts with the deference they are due, there is no evidence of duplication. The jury was instructed on the legal distinctions between the two claims. It assessed damages against all five defendants on the false arrest claim, but only against Hayes and Swearengen on the malicious-prosecution claim. That verdict demonstrates that the jury understood that separate conduct and harms corresponded to the distinct claims. Accordingly, the defendants have not demonstrated that they were prejudiced by the district court's decision not to give their proposed duplicative damages instruction. *See Cruz*, 579 F.3d at 843.

Next, the defendants argue that the district court erroneously rejected their instruction informing the jury that Kevin failed to mitigate his damages because he did not move to suppress his confession in his criminal case. But the district court rejected the proposed instruction without prejudice, telling the defendants that they could file a new mitigation instruction omitting the one sentence referencing Kevin's failure to file a motion to suppress. Counsel for the defendants did not object to that ruling, and on appeal the defendants have not argued that they tendered a revised instruction as the court requested. Accordingly, they have waived their argument with respect to the mitigation instruction.

The defendants also argue that the district court erroneously excluded their proposed instruction informing the jury that Kevin is not constitutionally entitled to a full police investigation or specific testing. The district court pointed out that Kevin never argued that he was entitled to those things; instead, he argued that the defendants intentionally obstructed DNA testing and framed him for the murder. Under those circumstances, we agree with the district court that the proposed instructions were more likely to confuse, than to assist, the jury. Their exclusion did not prejudice the defendants.

The defendants' last argument pertaining to jury instructions is that they were prejudiced by the district court's denial of their request to excise a reference to Will County from one of the instructions regarding damages. The defendants argue that the instruction falsely suggested that Will County's deep pockets would cover the damages, thus loosening the jury's inhibitions about a large damages award. They say that the Foxes' attorney made this suggestion explicit when she told the jury in closing that it should award damages that "send a message to Will County." But the defendants did not object to that comment when it was made, *see Lewis*, 590 F.3d at 444, and their own attorneys repeatedly referenced the "Will County Defendants" during the trial. As a result, there is no reason to suppose that they were prejudiced by the district court's jury instruction decision.

As we mentioned in a footnote many pages ago, two insurers, the American Alternative Insurance Corporation and the Essex Insurance Company, were granted leave

to intervene in the case for purposes of appealing the punitive damage awards. Leave to join in was granted after the defendants entered into an agreement to assign their individual rights and interests in two insurance policies to the Foxes in exchange for a purported "Release of Personal Liability To Satisfy The Punitive Damage Award." The individual defendants then simultaneously withdrew their appeal of the punitive damage awards. The intervenors seek reversal of the punitive damage awards or, alternatively, a remand for a new trial.

The intervenors argue that the punitive damage verdicts are inconsistent. The individual defendants did not object to the supposed inconsistency before the jury disbanded, so the Foxes assert that the present argument has been waived. Several circuits have held that the failure to lodge a contemporaneous objection to an inconsistent verdict constitutes a waiver, s*ee, e.g., Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006); *Oja v. Howmedica, Inc.*, 111 F.3d 782, 790 (10th Cir. 1997); *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1331 (9th Cir. 1995), but we have left that question open, *see Pearson v. Welborn*, 471 F.3d 732, 739 (7th Cir. 2006); *Carter v. Chi. Police Officers*, 165 F.3d 1071, 1079-80 (7th Cir. 1998). We need not resolve the question here, because we fail to see any inconsistency.

A new trial based on inconsistent verdicts is warranted only when a jury's verdict cannot be reconciled with the evidence at trial. *Pearson*, 471 F.3d at 739. Any plausible explanation for the verdict precludes reversal. *Carter*, 165 F.3d at 1081. Here, the intervenors argue that the

jury's finding in favor of the defendants on Kevin's false imprisonment claim cannot be reconciled with its findings for Kevin on the false arrest and malicious prosecution claims. Specifically, they note that false imprisonment requires a finding that the officers lacked probable cause and that their conduct was willful and wanton. They argue that the jury's finding on false imprisonment implies either that it found no probable cause, which would be inconsistent with the false arrest and malicious prosecution findings, or that it found that the underlying conduct was not willful and wanton, which would be inconsistent with the punitive damage awards.

Because we review the findings in the light most favorable to the verdicts, *Carter*, 165 F.3d at 1079, we presume that the jury found a lack of probable cause but did not agree that the defendants' conduct was willful and wanton. Thus, the question is whether a lack of willful and wanton conduct can be squared with the punitive damages on the false arrest and malicious prosecution claims. It can. The court instructed the jury that willful and wanton conduct shows "an actual or deliberate intention to cause harm or, if not intentional, shows an utter indifference to or conscious disregard for the safety of others . . . ." It instructed the jury that punitive damages could be assessed if it found that the defendants' conduct was malicious or reckless. It explained that malicious conduct "is accompanied by ill will or spite or is done for the purpose of injuring plaintiffs." Under this set of instructions it is plausible that the jury concluded that the officers' actions were not reckless or deliberate,

but that they were "accompanied by ill will or spite." Because there is a plausible basis to find the verdicts consistent, a new trial is not warranted. *Id.* at 1081.

The defendants also argue that the district court should have granted their motion for a new trial because, according to them, the compensatory damages are excessive with respect to the false arrest claim and Melissa's claims for loss of consortium and IIED. We review the district court's decision not to grant a new trial based on excessive damages only for abuse of discretion. *Thomas*, 588 F.3d at 461. In reviewing whether an award of compensatory damages is unreasonably large, we ask "whether the award is 'monstrously excessive,' 'whether there is no rational connection between the award and the evidence,' and whether the award is comparable to those in similar cases." *Id.* at 463 (quoting *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 611 (7th Cir. 2006)); *see also Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009).

The defendants argue that the $2.7 million award for Melissa's loss of consortium is so excessive that it should "shock the judicial conscience." *See Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). But their argument fails to account for the unique circumstances underlying Melissa's claim. During Kevin's incarceration Melissa was separated from her main source of emotional support at a time when she was coping with extraordinary grief. She was left alone to help Tyler deal with his own grief and fear and was thrust into the position of being a single parent to him at a time when Tyler most needed the support of both parents. She was forced to endure

Riley's birthday and the first anniversary of her death without Kevin, whom she testified was the only person who could understand those experiences. In short, the eight months of Kevin's incarceration came at a crucial moment in their marriage, and accordingly there is a rational connection between the evidence and the substantial award. *See Naeem*, 444 F.3d at 611. And although the award undeniably is high, it is not out of line with other loss of consortium verdicts upheld by Illinois courts. *See, e.g., Velarde v. Ill. Central R.R. Co.*, 354 Ill. App. 3d 523, 543 (Ill. App. Ct. 2004) (upholding $3.5 million loss of consortium claim); *DeYoung v. Alpha Constr. Co.*, 186 Ill. App. 3d 758, 765-67 (Ill. App. Ct. 1989) (upholding $3.6 million loss of society award for death of 75-year-old). Given the circumstances, we do not think the district court abused its discretion in concluding that the $2.7 million award is not "monstrously excessive." *See Thomas*, 588 F.3d at 463.

By contrast, the evidence does not come close to supporting the $1 million compensatory award for Melissa's IIED claim. The Foxes have pointed to no evidence that any of her lingering emotional problems are linked to her short interaction with Hayes. There is no connection between the evidence that she was terrified and that her "spirit was crushed" and the jury's $1 million award against Hayes on this claim. Nor have the Foxes pointed to any cases upholding comparable awards for an IIED claim based on the fallout of a brief verbal interaction. Indeed, the cases we found affirming damage awards for IIED claims based on verbal altercations involved awards no greater than $150,000. *See, e.g., Littlefield v.*

*McGuffey*, 954 F.2d 1337, 1348-49 (7th Cir. 1992); *Webb v. City of Chester, Ill.*, 813 F.2d 824, 837 (7th Cir. 1987). Accordingly, we agree with the defendants that the $1 million award for Melissa's IIED claim is excessive.

Similarly, we think the district court abused its discretion in brushing past the defendants' argument that the $1.6 million false arrest award to Kevin (excluding Ruettiger) is excessive. Damages on a false arrest claim cover the period of detention from a plaintiff's arrest until the first issuance of process. *See Wallace v. Kato,* 549 U.S. 384, 389-90 (2007); *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 899-900 n.9 (7th Cir. 2001). Kevin was arrested (i.e., not free to leave) shortly after 8 p.m., on October 26, 2004. He appeared in court on October 28. For this, the jury awarded $1.7 million, a staggering rate of about $1,100 per minute. The Foxes assert without argument that the false arrest award covers the 84 days between Kevin's arrest and his arraignment. But a state judge determined at the first hearing that there was sufficient basis to detain Kevin for further proceedings. It is hard to see how that proceeding could be viewed as anything other than the issuance of process, *see Young v. Davis*, 554 F.3d 1254, 1257 (10th Cir. 2009), and accordingly we agree that the false arrest damages can cover only some 36 hours of detention that preceded the hearing. There is no way to bridge the gap between such a brief detention and a $1.7 million award. Especially because the jury awarded less than half that amount on Kevin's malicious prosecution claim, which covered the remaining 242 days of his incarceration, the award is simply unsupported by the evidence. Accordingly, we

agree with the defendants that the false arrest damage award cannot stand.

But contrary to the defendants' assertions that the excessive damages require a new trial, we believe a remittitur is the appropriate remedy to correct any error that may have occurred. *See Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1314 (7th Cir. 1985); *Richardson*, 175 Ill. 2d at 115; Wright, Miller & Kane, *216-17 Federal Practice & Procedure* § 2820 (2d ed. 1995 & Supp. 2009). This is not a case where the IIED or false arrest claims are unsupported as a matter of law; the problem is simply that the jury overcompensated the Foxes for those two claims. The trial in this case was long, intensive, and, from what we can see from the record, contentious. More than 40 witnesses took the stand. Everyone involved made substantial investments of their time and money. There is no need to squander those investments when a remittitur can resolve the overcompensation problem. Thus, with respect to Melissa's IIED claim, we order a remittitur to $150,000. As for Kevin's false arrest claim, we order a remittitur to $16,000 ($5,000 each from Hayes, Swearengen, and Guilfoyle and $1,000 from Wachtl). If the Foxes do not consent to the remittiturs, the district court is instructed to grant the motion for a new trial on the question of damages for the two claims. *See Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1244 (7th Cir. 1982).

The remainder of the arguments raised by the defendants and intervenors focus on their assertion that the punitive damage awards cannot stand because

they are listed separately in the jury verdict form and thus are untethered to any of the particular claims. They argue that because there is only a general verdict with respect to the punitive damage awards, there is no way to know how much of the punitive damage awards are tied to Kevin's IIED claim (which, they argue, already includes a punitive element) or the substantive due process claim on which they are entitled to judgment as a matter of law. These arguments rest entirely on what the defendants and intervenors now assert is an incorrectly structured verdict form, but as the Foxes correctly point out, the defendants never objected to the structure of the verdict form at trial, nor did they propose their own version of the jury form. Accordingly, they have waived their argument that the punitive damage awards cannot stand because the verdict form does not tie them to specific substantive claims. *See Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 966 (7th Cir. 1996); *Rosario v. Livaditis*, 963 F.2d 1013, 1022 n.4 (7th Cir. 1992); *Perry v. Larson*, 794 F.2d 279, 285 (7th Cir. 1986).

With respect to Kevin's substantive due process claim, the judgment of the district court is VACATED and the matter REMANDED with instructions to enter judgment for the defendants. With respect to Kevin's false arrest claim and Melissa's IIED claim, if the Foxes consent to the remittiturs we have ordered, the award on Melissa's IIED claim will be reduced to $150,000. The award on Kevin's false arrest claim will be reduced to $16,000.

Thus, to summarize, of the $12,200,000 in play on this appeal, the Foxes may have judgment for $8,166,000

if the remittiturs we have ordered are accepted. If not, they may have judgment for $8,000,000 and a new trial on the two claims that we have cut back. But we hasten to add that if the Foxes elect to have a new trial on the claims we have reduced, any new award, considering the substantial damages awarded on the other claims, will have to be close to the vicinity we have suggested to be sustained as reasonable.

For all these reasons, the judgment of the district court is AFFIRMED in part and REVERSED and VACATED in part consistent with this opinion.