In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 07-1043

ROBERT HALL and JOLENE HALL,

*Plaintiffs-Appellants*,

*v.*

MATTHEW BATES, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 03 C 50557—**Philip G. Reinhard**, *Judge*.

_____

ARGUED SEPTEMBER 28, 2007—DECIDED NOVEMBER 15, 2007

_____

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs, who brought suit against two police officers employed by the Village of Rockton, Illinois, for false arrest in violation of the Fourth Amendment, appeal from the grant of summary judgment to the defendants. Tiny Rockton (population 5,200) in northwestern Illinois, near the Wisconsin border, is something of a golf Mecca. There are three golf courses within the Village limits and 27 more within 15 miles of the Village center. Yet not content with this distinction, Rockton's home page promises an abundance of delights unrelated to golf, for "Rockton is the kind of Village that

people fall in love with. A treasure nestled on the northern edge of Winnebago County, it is history, with a future. Whether you come because of the schools, the culture, the countryside, the business opportunities, or just to be a part of its small town charm, Rockton offers a million reasons to stay." This promise was broken to two of its residents, a married couple named Robert and Jolene Hall, the plaintiffs in this civil rights suit. 42 U.S.C. § 1983.

Robert Hall submitted to his insurance company a claim for approximately $1,800, stating that his golf bag had been stolen, and that the bag had contained a set of Ping Zing irons with a retail value of $850, three Ping Zing woods worth $239.99 each, and lesser items. The insurance company told him he needed a police report, so he called the Rockton police department, which sent two of its eleven full-time officers to the Halls' home. Robert Hall had had some minor run-ins with the police and was apparently not much liked by them. Nor, in all likelihood, did they like being summoned to his home in order to spare him the bother of coming down to the police station to fill out a police report.

He told the officers that the golf bag with its valuable contents had been stolen in a burglary of his home three weeks earlier. He also told them (he testified) that the aggregate value of the stolen items was $1,700, which is close enough to the amount of the claim that he submitted to the insurance company not to have raised a red flag. The police testified that he said the irons were worth $1,100; but in the present posture of the case we must assume that Hall was telling the truth. One of the officers also testified—and this part of his testimony is corroborated by his subsequent actions—that he *thought* Hall said that the irons were "Shapiros" worth $1,100. The officer

had worked in a golf shop and, never having heard of "Shapiro" golf clubs, thought they must be some kind cheap iron that one could buy for $100 to $500. There is a good reason he had never heard of them: there is no such brand. Hall testified that he had told the police the irons were "Shimanos," not "Shapiros." Shimano is a Japanese company that makes fishing and cycling equipment and that made golf clubs for a brief period ending in 2005 under the brand name "Ultegra." Because it appears that very few were sold in the United States, the fact that Hall knew the name is some evidence that the irons were indeed Shimanos. And Shimano's Japanese web site (though not its English-language one) indicates that Ultegra was a pricey brand. Hall, however, presented no evidence of what he had paid for his Shimano irons, if that is really what they were.

So Hall had submitted an insurance claim (which, incidentally, the insurance company, despite its demand for a police report, paid before Hall spoke to the police) for the loss of Ping Zing golf clubs, yet had told the police that he had lost golf clubs of a different brand that even the police officer who had worked in a golf shop did not recognize and therefore assumed must be of much lesser value than Ping Zings. The discrepancy between what Hall told the police and what he had told the insurance company, the indication that the irons were much less valuable than he had represented them to be, his wife's statement to the police that she had remembered writing a check for $400 or $500 for the clubs (not $1,100 or $1,700 or $1,800), his seeming nervous when talking to the police and the fact that he kept glancing in an odd manner at his wife, along with the further oddity of his not having reported a residential burglary to the police

until told to do so by the insurance company—the circumstances taken as a whole created probable cause to believe that Hall had committed insurance fraud, and so scotches his claim of false arrest.

The Halls' lawyer makes much of the fact that the police officer who had worked in the golf shop asked the shop's proprietor, as part of his investigation of the Halls, about the value of "Shapiro" irons, and the proprietor said he had never heard of them. But all that this shows is that the officer misheard Hall, which is neither surprising nor culpable; and if he had heard him aright it would have made no difference, because the Shimano brand of golf clubs is so obscure that the officer would reasonably suppose them of lesser value than Ping Zings. He testified that he has heard of Shimano clubs but had thought them a cheap brand. All that is irrelevant, because at the time of the arrest he thought the irons were "Shapiros," a notably obscure brand—since it does not exist.

Whatever Hall said or was heard to say, it was not (he admits) Ping Zing. Ping Zing is top of the line—a club used by professionals as well as by amateurs—and if Hall had actually lost (or perhaps hidden or sold) a less valuable set of clubs, as the police could reasonably suspect, when he had represented them to the insurance company as Ping Zings, this was evidence of insurance fraud.

It is true that the state's attorney for Winnebago County declined to prosecute Hall. But no inference can be drawn that he did so because he didn't think there was probable cause to believe that Hall had committed a crime. Hall's crime (if indeed he did commit insurance fraud) was minor. Winnebago County contains the third-largest city in Illinois—Rockford—which has serious crime problems.

The state's attorney may have decided that his prosecutorial resources could be better employed elsewhere, especially as the insurance company never complained about the Halls' claim.

In the course of the police investigation, one of the defendant officers called Jolene Hall at home one Saturday morning and said he would like her to come down to the police station for an "update" on her husband's missing golf clubs. He said the interview would take only a few minutes. When she arrived, the station was almost deserted and she had to enter through the back entrance. She was led to a conference room where the two defendant officers questioned her aggressively for more than an hour, telling her falsely that they had proof that her husband had sold or hidden his golf clubs and threatening to arrest her as an accomplice. She denied everything. They told her to call her husband and tell him to come to the police station, which she did, and when he arrived both were questioned briefly. Then she was led down a corridor to the station's lobby and on the way asked to use the restroom but was told she couldn't because it was locked and the officers didn't have the key. They left her alone in the lobby and she thought the doors leading from it were locked. Eventually she knocked on one of them and one of the officers opened it and told her he was arresting her husband and would arrest her if any evidence against her turned up. She then left, having spent two and a half hours at the police station.

She claims that she reasonably believed that she was not free to leave during those two and a half hours and therefore was "seized" without probable cause, in violation of the Fourth Amendment. She relies heavily on the aggressive questioning by the police. But she does not explain

why, if she wanted to leave, she didn't ask them whether she was under arrest. Had she done so, and one of the defendants had said yes, it would be plain that her constitutional right had been violated. See *United States v. Cranley*, 350 F.3d 617, 620 (7th Cir. 2003); *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996); *United States v. McFarley*, 991 F.2d 1188, 1192 (4th Cir. 1993). The fact that the police station seems to have been deserted except for the two boorish officers no doubt made the normally rather intimidating atmosphere of a police station more so, but police are entitled to invite witnesses, including suspects, to the police station on weekends for questioning. When a suspect does not ask whether he is free to leave, the inference arises that he does not want to terminate the questioning but instead wants to use the opportunity to deflect the suspicion of the police. The inference can be rebutted but was not in this case.

It would be possible to impose a *Miranda*-like rule requiring police whenever they question someone at a police station to advise him that he is not under arrest and is therefore free to leave at any time. But the suggested rule was rejected in *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996). Creating such an impediment to police investigations has not been shown to be necessary in order to prevent police from detaining someone without probable cause, since all a person has to do in order to test their right to detain him is to ask them whether he is free to leave. Such an approach—placing on the suspect the burden of ascertaining whether he is in fact detained—is preferable to speculation by judges or juries on whether the circumstances of a particular interrogation were so intimidating that the average person being questioned would have thought himself under arrest even though he

made no effort, as he could easily have done, to determine whether he was. Cf. *United States v. Cranley*, *supra*, 350 F.3d at 20. It's as if one were in a room with the door closed and rather than turning the knob one sued for false imprisonment, though in fact the door was not locked.

The plaintiffs raise a couple of other issues, but they do not warrant discussion.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*