# In the
# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 07-1328, 07-1810 & 07-2208

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CALVIN JAMES, *et al.,*

*Defendants-Appellants.*

———————————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 04 CR 285—**J.P. Stadtmueller**, *Judge.*

———————————

ARGUED JUNE 3, 2008—DECIDED SEPTEMBER 2, 2008

———————————

Before KANNE, SYKES, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* A federal jury convicted Ted Robertson, Calvin James, and Jarvis King of conspiring to distribute five kilograms or more of cocaine and 50 grams or more of cocaine base. *See* 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 846. The district court subsequently sentenced Robertson and James to 360 months' imprisonment each, and King to life in prison. All three men challenge their convictions on appeal, and James and King challenge their sentences as well. We affirm.

## I. HISTORY

In December 2004, a federal grand jury returned a one-count indictment against 29 defendants, including Robertson, James, and King, alleging that they were members of what was more widely known as the Cherry Street Mob—a loosely organized, long-running drug-trafficking ring that operated in the Lisbon Square neighborhood in the west side of Milwaukee, Wisconsin. *See* 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 846. Twenty-five of Robertson's, James's, and King's named co-defendants eventually entered into plea agreements with the government. But Robertson, James, and King each eschewed the idea of pleading guilty, and elected to proceed to trial. At trial, the government presented evidence of the three men's participation in the Mob, including the testimony of nine of their co-conspirators—Kevin Arnett, Corey Crook, Cameron Gilbert, Joseph Gooden, Kinyater Grant, Marlon Hood, Percy Hood, Dale Huff, and Lanell Taylor—and recordings of wiretapped telephone conversations between several members of the conspiracy. That evidence, which we recount in a light most favorable to the government, *United States v. Gougis*, 432 F.3d 735, 743 (7th Cir. 2005), revealed the following:

Beginning in 1988, Robertson, James, and several of their co-conspirators began selling small amounts of powder cocaine near Cherry Street in Milwaukee's Lisbon Square neighborhood—a neighborhood that, at the time, was transforming essentially into an open-air drug market. At first, Robertson acted as the primary source of cocaine for the group and recruited his friend, Huff,

to sell drugs for him. But a few years after Robertson enlisted Huff, Huff established himself as the primary source of cocaine for the drug dealers operating in the Cherry Street area.

The drug dealers decided to call themselves the Cherry Street Mob, and worked to consolidate their efforts to open and to maintain a series of drug houses; they also eventually graduated from selling powder cocaine to manufacturing and selling crack cocaine. Each of the three defendants played an integral role in the consolidation of the Mob's presence in the neighborhood. James allowed his mother's home to be used as a drug house for Robertson, Huff, and others; worked in a series of drug houses later established by Mob members; acted as a middleman to broker drug deals between other members of the Mob; and helped Mob members develop drug clientele. Moreover, James developed a close relationship with Huff, and in 2003 Huff employed James as a bodyguard. As part of his duties, James accompanied Huff to deals with the Mob's suppliers, helped Huff run several drug houses, and traveled to Texas with Huff to obtain large quantities of cocaine to supply the organization.

Robertson, in turn, operated a series of drug houses with a number of other members of the Cherry Street Mob, including James and King. Robertson allowed numerous members of the Mob to manufacture and to package crack at these houses. And although Huff had become the primary source of cocaine for the Cherry Street area, Robertson also occasionally supplied the drug to other members of the Mob.

King was brought into the fold after the Cherry Street Mob had been operating for nearly a decade, and he began by working in drug houses run by Robertson and his cousins, Percy and Marlon Hood. King later operated a drug house with Robertson, and eventually began operating and overseeing drug houses with, among other co-conspirators, his cousin Percy. As part of this partnership, King and Percy would pool their money to purchase cocaine from Huff.

The Cherry Street Mob went through several periods of fluctuation during its 16 years of operation. Several of the Mob's members—including Robertson, Huff, and King—were occasionally arrested for various crimes and sent to jail or prison for short periods of time; the men would then resume their roles in the conspiracy upon their release. The group also experienced some intra-organizational discord over money, drug supplies, and clientele. These disputes led to some drug houses disbanding, and sometimes led to violence; for instance, a dispute led Robertson to "bust[ ] up" a drug house so that others could not operate there, and a dust-up over money led King to shoot Robertson in the foot with a handgun.

But these occasional disruptions aside, each member of the Cherry Street Mob depended on each other to a substantial degree. For the most part, each member would obtain his or her cocaine from Huff or Robertson, and would refer customers to other members' houses if his or her supply of crack was running low. Moreover, the members depended on one another to defend the Cherry

Street area against encroaching outside drug-dealers. Robertson, James, King, and Huff, in particular, played large roles both in protecting the Cherry Street territory and in acting as enforcers for the Mob. In fact, Huff hid firearms in various locations throughout the Cherry Street area so Mob members would have easy access to them in the event that violence erupted. Finally, the members all worked to notify each other of the presence of police officers in the area. King's cousin, Marlon Wood, best described the Mob members' interdependency: "[W]e all in the same conspiracy . . . we all working a big ball, like I told you all, it seems like it's a knot. Jarvis King, me, him, Percy Hood . . . we did our thing. I messed with Ted Robertson. [Percy] messed with Ted Robertson and Calvin James. You know, Jarvis is my first cousin, so you know, he family, so when we did something we was doing it together."

At the close of evidence, Robertson, James, and King all moved for judgments of acquittal, arguing that the evidence failed to establish that they participated in the drug conspiracy. *See* Fed. R. Crim. P. 29(a). The district court denied the motions, determining that the wiretap evidence and the testimony of the three men's co-conspirators was "more than sufficient to demonstrate the existence of a conspiracy." The court then submitted the case to the jury, which subsequently found Robertson, James, and King guilty. Shortly thereafter, the court sentenced Robertson and James to 360 months' imprisonment each, and King to life.

## II. ANALYSIS

On appeal, Robertson, James, and King all argue that the district court erred by denying their motions for judgments of acquittal because the evidence presented at trial was insufficient to support their convictions. Each man employs a different legal theory on this point, however. Robertson asserts that, although he had his own independent drug operation on Cherry Street, there was no proof that he participated in the wide-reaching conspiracy alleged in the indictment. According to Robertson, the evidence at trial showed that he participated in one of many smaller conspiracies that competed against one another in the Cherry Street drug market, and even used violence against one another. Thus, Robertson argues, there was a variance between his smaller conspiracy proven at trial and the overarching single conspiracy alleged in the indictment. *See United States v. Womack*, 496 F.3d 791, 794 (7th Cir. 2007) ("A conspiracy variance claim is a challenge to the sufficiency of the evidence . . . ."). James, in turn, contends that there was no evidence showing that he knew of the conspiracy or "provided some service" in furtherance of the conspiracy. King similarly argues that, although he trafficked cocaine, there was no evidence that he "knowingly adopted" the conspiracy's "common purpose."

To prevail on appeal, Robertson, James, and King must show that the court incorrectly concluded that there was sufficient evidence to sustain their drug-conspiracy convictions. *See* Fed. R. Crim. P. 29(a); *see also United States v. Bolivar*, 532 F.3d 599, 603 (7th Cir. 2008). Although

we review the district court's decision *de novo*, *see United States v. Emerson*, 501 F.3d 804, 811 (7th Cir. 2007), the three men face a "'nearly insurmountable'" burden when challenging that decision, *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)); *see also United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2007). Viewing the evidence presented at trial in the light most favorable to the government, we will overturn Robertson's, James's, and King's convictions only if "the record contains no evidence, regardless of how it is weighed," from which the jury could have concluded beyond a reasonable doubt that they were guilty of conspiring to traffic cocaine. *Gougis*, 432 F.3d at 743-44 (internal quotation marks and citation omitted).

Robertson's, James's, and King's arguments all fail. Robertson, in particular, cannot prevail on his contention that there was a variance between his smaller conspiracy proven at trial and the overarching single conspiracy alleged in the indictment. In making his argument, Robertson ignores that, "'[e]ven if the evidence arguably established the existence of multiple conspiracies,'" the district court nevertheless correctly denied his motion for a judgment of acquittal "'if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment.'" *Womack*, 496 F.3d at 794 (quoting *United States v. Williams*, 272 F.3d 845, 862 (7th Cir. 2001)); *see also United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991).

And there was ample evidence showing that the single conspiracy charged in the indictment existed. Although

the jury heard evidence detailing the intra-organizational disruptions within the Cherry Street Mob, the jury also heard a substantial amount of evidence describing how the Mob worked as a single unit. Specifically, the evidence detailed the formation of the Mob and outlined how its members depended on one another to further their drug-trafficking goals. For instance, each member (1) obtained his or her cocaine largely from Huff or Robertson; (2) would refer customers to other members' drug houses if his or her supply of crack was low; (3) depended on one another to defend the Cherry Street area against encroaching outside drug-dealers; and (4) would warn each other of police presence in the area. As Marlon Wood testified, the members were "all in the same conspiracy." The jury also heard evidence detailing Robertson's participation in that conspiracy. In fact, the evidence described (1) Robertson's role in the Mob's formation; (2) how he was the Mob's initial source of cocaine, and later its occasional source of the drug; (3) how he set up, worked in, and oversaw drug houses in the Cherry Street area; and (4) how he provided security from outside drug dealers and police. And because the evidence clearly established that Robertson acted to further the Mob's collective drug-trafficking operations, his challenge to the evidence establishing the single conspiracy is meritless. *See Womack*, 496 F.3d at 795 ("The government was not required to show that [the defendant] conspired with all of the previously indicted co-conspirators . . . . The government needed only to prove that [the defendant] joined the agreement alleged."); *Townsend*, 924 F.2d at 1390 ("[I]f the evidence indicates that a defendant must have known that

his actions were benefitting a larger conspiracy, he may be said to have agreed to join that conspiracy.").

Equally meritless are James's and King's arguments that the government introduced no evidence showing that they knew of, or participated in, the conspiracy. To prove that James and King were members of the conspiracy, the government needed to show that the two men "embraced the criminal objective of the conspiracy, that the conspiracy continued towards its common goal, and that there were co-operative relationships." *United States v. Gilmer*, Nos. 06-3201 & 06-3250, slip op. at 9 (7th Cir. July 18, 2008); *see also United States v. Messino*, 382 F.3d 704, 709 (7th Cir. 2004). And while examining James's and King's participation in the conspiracy, the critical inquiry "'is whether the factfinder [could have] reasonably conclude[d] from the proof that [James and King] likely had some appreciable ability to guide the destiny of the [cocaine].'" *United States v. Starks*, 309 F.3d 1017, 1024 (7th Cir. 2002) (quoting *United States v. Staten*, 581 F.2d 878, 883 (D.C. Cir. 1978)); *see also Gilmer*, slip op. at 9.

The government introduced ample evidence of James's and King's participation in the drug conspiracy. Contrary to James's assertions, the government sufficiently established that he both knew of the conspiracy and played a role in it. The evidence introduced at trial showed that James (1) played a central role in establishing the Cherry Street Mob; (2) helped set up drug houses over the years (including one in his mother's home); (3) protected the Mob's territory through violence; and (4) acted as a body-guard and enforcer for Huff—the Mob's main supplier

of cocaine. And although James's role in the conspiracy was not as central as, say, Huff's or Robertson's role, that fact does not diminish the government's evidence showing that James played a role in establishing and furthering the Mob's drug-trafficking efforts. *See Gilmer*, slip op. at 9 ("'[O]ne need not be at the heart of the conspiracy to be part of its web.'" (quoting *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003))); *United States v. Miller*, 159 F.3d 1106, 1109-10 (7th Cir. 1998) ("A defendant need not know all of the co-conspirators or know the full extent of the conspiracy to be convicted."). The government likewise established that King (1) worked in drug houses run by Robertson; (2) later operated a drug house with Robertson; (3) eventually began operating and overseeing drug houses with, among other co-conspirators, his cousin Percy Hood; and (4) obtained his cocaine supply primarily from Huff. King also warned his co-conspirators about police presence and worked to protect the Mob's territory from outside drug dealers. Based on the overwhelming evidence of James's and King's roles in the Mob's drug enterprise, the jury could have easily concluded that both men embraced the conspiracy's objectives, worked to continue the conspiracy, and cooperated with each other to further the conspiracy, *see Gilmer*, slip op. at 9; *Messino*, 382 F.3d at 709, and could have just as easily found that the two men "'had some appreciable ability to guide the destiny'" of the cocaine in which they trafficked, *Starks*, 309 F.3d at 1024 (quoting *Staten*, 581 F.2d at 883). James's and King's challenges to the sufficiency of the evidence thus fail.

In addition to their meritless arguments as to the sufficiency of the evidence, James and King present a number of additional arguments attacking their convictions on other grounds and challenging their respective sentences. But each of these arguments has been foreclosed by decisions of the United States Supreme Court, has already been rejected by us, or simply is frivolous. James's and King's additional arguments thus do not warrant further discussion. *See United States v. Murray*, 474 F.3d 938, 939 (7th Cir. 2007); *United States v. Scott*, 405 F.3d 615, 616 (7th Cir. 2005); *see also Hall v. Bates*, 508 F.3d 854, 858 (7th Cir. 2007).

### III.  CONCLUSION

We AFFIRM James's, Robertson's, and King's convictions, as well as James's and King's respective sentences.