In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2192

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MICHAEL ROUX,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09 CR 10022—**Michael M. Mihm**, *Judge*.

ARGUED MARCH 29, 2011—DECIDED MAY 10, 2013

Before ROVNER, WILLIAMS, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge*. A jury convicted defendant-appellant Michael Roux of inducing or coercing a minor to create sexually explicit images, in violation of 18 U.S.C. § 2251(a). Roux appeals, contending that the district court erred in admitting certain evidence against him and that the government committed certain missteps at trial which should have prompted the court to declare a mistrial. Finding no error in any of the

district court's rulings, and being satisfied that Roux received a fair trial, we affirm Roux's conviction.

## I.

On appeal from Roux's conviction, we are obliged to summarize the evidence in the light most favorable to the government. *E.g., United States v. James*, 540 F.3d 702, 704 (7th Cir. 2008).

In May 2002, after dating Roberta H. for a number of months, Roux moved in with Roberta and her four daughters, who ranged in age from 7 to 14 years old at that time. In November 2003, Roberta's eldest daughter, CC, reported that Roux was sexually molesting her. Although the Illinois Department of Children and Family Services ("DCFS") investigated and determined the charge to be unfounded, CC was later removed from the household. She never returned.

After CC's departure, Roux began molesting another of Roberta's daughters, EV. The abuse persisted and progressed over a period of years. EV was 9 or 10 years old when Roux first touched her inappropriately: he would rub her beneath her nightgown while she sat on Roux's lap. When she began high school in 2006, Roux was forcing EV to have sexual intercourse with him.

In March 2008, EV at last told her mother about the abuse. When Roberta confronted Roux, he acknowledged the abuse and she threw him out of the house. But Roux soon commenced an ultimately successful campaign for readmittance to the household, promising

both Roberta and a furious EV that he would not touch EV again. The promise proved short-lived; soon enough, the abuse (including oral sex as well as intercourse) resumed.

The abuse finally came to the attention of the authorities in May 2008, when EV was 16. One day Roux, who made a habit of checking up on EV, visited her school and saw her sitting with someone he had forbidden her to see. (Roux had prepared a list of such individuals, had EV sign it, and had given it to the school principal.) Roux told her he was going to remove her from school for the remainder of the year. A panicked EV ran to the school guidance counselor and the school principal, asked them to call the police, and told them that Roux had been raping her for some time and that she could no longer stand it. The principal advised Roux that he was going to contact the authorities and prevented Roux from taking EV with him from the school grounds. Roux found Roberta and pleaded with her to "please back me up on this. You didn't see anything." R. 80 at 222, Tr. 320. He then fled, only to be arrested two days later when he returned home to gather his belongings.

EV subsequently informed the police that during the course of the abuse, Roux had taken sexually explicit photographs of her and had forced her to take similar photographs of himself; some of the photographs were taken while Roux was engaged in intercourse with EV. The photographs had been taken in the previous six months. Armed with this information, investigators

seized a computer and two digital cameras from the house that Roux had shared with Roberta and the girls. A computer forensic specialist was able to recover a number of images which had been deleted from the computer after they had been downloaded from a digital camera and then transferred to a USB "thumb" drive. Among the recovered images were digital photographs of EV's exposed breasts, her fingers inserted into her vagina, several showing her engaged in sexual intercourse, and finally, a number of photographs of a man's penis. No male face was visible in any of the photographs.

Based on the recovered images, a grand jury charged Roux with one count of knowingly employing, using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, using materials that had been mailed, shipped, or transported in interstate commerce, in violation of section 2251(a). (A second count of the indictment, which sought forfeiture of the images and the equipment used to produce and store them, was later dismissed on the government's motion.) Roux pleaded not guilty to the charge, and the case was tried to a jury. Roux's theory of defense was that he was the family disciplinarian, that the girls had begun to rebel against his authority as they grew older, and that Roberta and her daughters were now attempting to frame him with false allegations. Among the government's witnesses against Roux were both EV and her mother. In addition, pursuant to Federal Rule of Evidence 404(b) and over Roux's objection, the court

allowed two of EV's sisters, CC and SH, to give testimony about the sexual abuse that Roux had inflicted on them. Roux took the stand in his own defense, denying that he had ever sexually abused EV or her sisters and also denying that he had taken the sexually explicit photographs of EV or forced her to take the images of herself. At the conclusion of the four-day trial, the jury convicted Roux. The court subsequently ordered Roux to serve a prison term of 360 months.

## II.

Roux challenges the fairness of his trial, contending that four errors undermined the presumption of evidence and improperly shifted the burden of proof from the government to him. Specifically, Roux contends that the district court abused its discretion in admitting both the testimony about the sexual abuse that EV's sisters suffered and two mug shots reflecting that Roux was heavier at the time of his arrest than he was at trial. Roux further argues that two errors by the government entitled him to a mistrial, which the district court denied: a prosecutor at one point in the trial referred to certain recorded telephone conversations that Roux had while in pretrial detention as "jail phone calls"; and, while cross-examining Roux, a prosecutor repeatedly asked Roux about various records and witnesses that might corroborate his testimony but which had not been produced.

A.  Prior instances of sexual abuse

Prior to trial, the government, citing Federal Rule of Evidence 404(b), filed a motion seeking the court's permission to introduce testimony from EV's sisters, CC and SH, that they too had been sexually abused by Roux. Rule 404 prohibits proof of a defendant's uncharged wrongful acts for the purpose of establishing his propensity to commit the charged offense, but allows the court to admit such evidence for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The government offered the evidence of the abuse suffered by EV's sisters principally to establish Roux's motive to commit the charged offense and his identity as the perpetrator. R. 76 at 15-16. Roux opposed the government's motion.

The court conducted a hearing on the motion, at the conclusion of which it found that the proffered evidence of sexual abuse met three of the four criteria we have identified for the admission of other acts evidence. *See, e.g.*, *United States v. White*, 698 F.3d 1005, 1017-18 (7th Cir. 2012) (per curiam), *cert. denied*, 2013 WL 754692 (U.S. Apr. 1, 2013). Specifically, the court determined that the government was offering the testimony of EV's sisters for a purpose other than to establish his criminal propensity; that the proffered testimony was sufficient to establish that Roux had engaged in uncharged acts of sexual abuse; and that although the proffered evidence was "very prejudicial," the danger of undue prejudice did not substantially outweigh the probative value

of this evidence. R. 76 at 28. The court reserved ruling as to the fourth factor: whether the sexual abuse of EV's sisters was sufficiently similar to the charged offense of using a minor to create sexually explicit photographs, given that EV's sisters were not photographed. R. 76 at 28.

The court subsequently issued a brief order finding that the proffered testimony met the similarity test and was therefore admissible, relying on this court's ruling in *United States v. Sebolt*, 460 F.3d 910, 917 (7th Cir. 2006). EV's sisters joined the roster of witnesses against Roux.

CC, the eldest of Roberta's daughters and roughly four years older than EV, testified that several months after Roux moved in with her mother in 2002, Roux began to touch her inappropriately, grabbing her breasts and fondling her buttocks. The following year, Roux came into her bedroom while she was sleeping, woke her up, exposed his penis to her, and invited her to compare its size to that of her mother's ex-boyfriend. Roux left the room when she screamed at him to get out. When CC reported Roux's misconduct to a school counselor, DCFS conducted an investigation. DCFS concluded that the allegation of abuse was "unfounded." CC was later placed in foster care after she assaulted Roux, and, as we noted previously, never returned to live with her mother and Roux. CC acknowledged on cross-examination that she had also been sexually abused by both EV's father, when he lived with Roberta, and by a male babysitter. The parties stipulated that both of those men pleaded guilty to criminal charges after CC reported the abuse.

SH was two years younger than EV. She testified that in late 2006, Roux came into her bedroom one night and, over her protests, touched her underneath her clothing in her "lower area" or "crotch," moving his hands in a circle and pushing down while he did so. R. 80 at 66-68, Tr. 164-66. She also said that Roux had placed his fingers inside of her. SH indicated that similar incidents occurred both before and after this occasion. On cross-examination, SH agreed that Roberta, CC, and EV did not like Roux and wanted him out of the house.

Roux contends that the admission of this testimony deprived him of a fair trial. "Child sexual abuse has a 'unique stigma' in society," he reasons, "and the introduction of such inflammatory evidence has a correspondingly unique prejudicial effect on juries." Roux Br. 6. He believes that because the acts described by CC and SH did not involve the creation of photographic images, their testimony had limited probative value with respect to the child pornography offense with which he was charged, and was likely to have misled the jury into thinking that the trial was about whether Roux had sexually assaulted EV and/or her sisters. At the same time, their testimony was so inherently prejudicial as to make it probable that the jury was likely to convict him on the basis of his prior bad acts, regardless of whether it was convinced beyond a reasonable doubt that he had committed the pornography offense. Finally, Roux argues that CC's testimony was insufficient to support a finding that Roux in fact committed the acts she described, given that DCFS investigated her allegations in 2003 and yet labeled them

"unfounded." In any case, because the acts CC described took place some four years before the charged pornography offense, Roux contends they were too remote to qualify for admission under Rule 404(b). We review the district court's decision to admit the testimony for abuse of discretion. *E.g.*, *White*, 698 F.3d at 1018.

The first point bearing mention is that Roux's defense—that he did not take the sexually explicit photographs of EV and had never engaged with her in the sexual conduct depicted in some of those photographs, and was instead being framed by Roberta and her daughters—necessarily implicated his motive to commit the charged offense. Motive is typically not an element of the offense, but it is a factor that often points to who may have committed the crime. "[U]nlike issues of knowledge and intent, the defendant's motive—an explanation of *why* the defendant would engage in the charged conduct—becomes highly relevant when the defendant argues that he did not commit the crime." *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012) (emphasis in original), *pet'n for cert. filed* (U.S. Apr. 4, 2013) (No. 12-9651); *see generally* 22A C. Wright & K. Graham, FEDERAL PRACTICE & PROCEDURE: FEDERAL RULES OF EVIDENCE § 5240, at 306 (2012) ("Evidence of motive may be offered to prove that the act was committed, to prove the identity of the actor, or to prove the requisite mental state."); *see also*, *e.g.*, *United States v. Rodriguez-Berrios*, 573 F.3d 55, 65 (1st Cir. 2009) (other acts evidence relevant to show defendant's motive, given his claim of innocence). This is why the government sought to establish Roux's motive to take sexually

explicit photographs of his girlfriend's daughter—to meet his defense of false accusation and to show that he in fact was the person who took the photos. And although both the government and the district court spoke of the evidence being relevant to both motive *and* identity, what they really meant was that proof of motive would serve to establish the identity of the perpetrator—the ultimate issue in the case. *See* Wright & Graham § 5246, at 337.[1]

The district court properly determined that the acts of abuse described by CC and SH were probative of Roux's motive to commit the charged child pornography offense. As Judge Mihm recognized, this court's decision in *Sebolt* held that "[p]rior instances of sexual mis-

---

[1] Proof of identity, as a distinct Rule 404(b) factor, would normally entail proof that a defendant's prior acts share distinctive characteristics in common with the charged crime. *See* Wright & Graham § 5246, at 340-41; *see also*, *e.g.*, *United States v. Simpson*, 479 F.3d 492, 497-98 (7th Cir. 2007), *abrogated in part on other grounds by United States v. Boone*, 628 F.3d 927, 933 (7th Cir. 2010); *United States v. Connelly*, 874 F.2d 412, 416-17 (7th Cir. 1989). Although the abuse described by CC and SH certainly share some characteristics in common with the abuse of EV, the briefs have not discussed in any real detail whether the common features are distinctive and meaningful enough to render the prior acts of abuse independently probative and admissible to show the identity of the perpetrator. Given our conclusion that the testimony of CC and SH was admissible as proof of Roux's motive, we need not explore this subject further.

conduct with a child victim may establish a defendant's sexual interest in children and thereby serve as evidence of the defendant's motive to commit a charged offense involving the sexual exploitation of children," including child pornography offenses, and "it also may serve to identify the defendant to the crime." 460 F.3d at 917. Apropos of Roux's observation that child sexual abuse and the production of child pornography are different offenses, such that the commission of the former does not establish a motive to commit the latter would serve only to misdirect and ignite a jury's passions, is the following passage from *Sebolt*:

> The motive to molest children does not completely overlap with the propensity to possess, transport, or advertise child pornography. *See* [*United States v.*] *Cunningham*, 103 F.3d [553,] at 556-57 [(7th Cir. 1996)]. If it did, then there would a greater chance that evidence of molestations introduced in this case was used to prove propensity. (Indeed the motive to molest children would completely overlap only with the propensity to molest children.) And the conceptual gap between molestation and child pornography is not so wide as to "induce the jury to decide the case on an improper basis . . . rather than on the evidence presented." *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003) (quotations and citations omitted). In other words, the molestations and the evidence supporting the statutory criminal elements were similar in character, *i.e.*, establishing Sebolt's sexually deviant mental state, so there is no reason to suspect the jury was inflamed by the admission

of the molestations. The prejudicial effect did not substantially outweigh the probative value, and the molestations were appropriately admitted.

460 F.3d at 917. *See also United States v. Russell*, 662 F.3d 831, 847-48 (7th Cir. 2011) (prior instances of inappropriate touching, by establishing defendant's sexual interest in his minor daughter, were probative of his motive to induce his daughter to create sexually explicit photographs in violation of section 2251(a)); *United States v. Courtright*, 632 F.3d 363, 369-70 (7th Cir. 2011) (prior instances of sexual misconduct with minor female tends to establish motive to commit charged crime of production, possession, and receipt of child pornography in violation of section 2251(a) and 18 U.S.C. § 2252(a)).

Undoubtedly, as Roux argues, testimony that the defendant has sexually abused children is highly prejudicial; but we are not persuaded that the district court wrongfully concluded that the testimony was *unfairly* prejudicial to Roux. *See* Fed. R. Evid. 403. Our cases addressing the admission of molestation evidence have recognized the substantial prejudice that it necessarily poses to any defendant; yet, we have regularly sustained the admission of such evidence when probative of a defendant's motive, intent, or other pertinent (and admissible) factor. *See, e.g., United States v. Chambers*, 642 F.3d 588, 595-96 (7th Cir. 2011); *United States v. Zahursky*, 580 F.3d 515, 525 (7th Cir. 2009); *Sebolt*, 460 F.3d at 917. We have also emphasized that we owe deference to a district judge's balancing of probative value versus risk of undue prejudice under Rule 403, given that the

judge presiding over the trial has a superior familiarity with and appreciation for the context and ramifications of the proffered evidence. *See, e.g.*, *White*, 698 F.3d at 1018; *United States v. Hosseini*, 679 F.3d 544, 556 (7th Cir.), *cert. denied*, 133 S. Ct. 623, 774 (2012). The record in this case reveals that the district judge carefully weighed the relevance of CC's and SH's testimony along with the prejudice that it posed to Roux's defense. The judge also gave the jury the standard instruction limiting its consideration of the other acts evidence, and notwithstanding the prejudicial nature of the evidence in this case, we presume that the jury followed that instruction. *E.g.*, *Chambers*, 642 F.3d at 595-96.[2] And, for what it is worth, we note that Roux does not contend, and the trial record does not indicate, that the government in any way overstepped its bounds with respect to this evidence. *See Sebolt*, 460 F.3d at 917. Having reviewed the record, we are not convinced that this is a case in which we should disturb the district court's judgment as to the relative probative value and prejudicial effect of the other acts evidence.

---

[2] The court gave the instruction both just prior to SH's testimony and in the final set of instructions to the jury. Roux has pointed out that the court did not give the instruction prior to CC's testimony. That is true, but somewhat misleading. Because CC testified immediately after SH, when the court gave the instruction in advance of SH's testimony, it explained that its testimony was applicable to "the next two witnesses." R. 80 at 54, Tr. 152. Roux did not ask the court to repeat the instruction when CC took the stand.

Having said this, we agree with Roux that given the inherently prejudicial effect of Rule 404(b) evidence involving other uncharged acts of sexual abuse, particularly the abuse of minors, courts must take particular care in admitting such evidence and in instructing the jury as to its appropriate use. Courts have a variety of tools at their disposal to address the prejudicial effects of this evidence, including: reserving ruling on the admission of the evidence until trial, when the relevance and ramifications of the evidence may be more concretely assessed, *see, e.g.*, *Russell*, 662 F.3d at 838-39 (court admitted evidence only after defendant testified in such a manner as to place in issue his purpose and intent in taking charged photographs); placing limits on the extent and detail of the evidence, *see id.* at 839 (court allowed government to establish that inappropriate touching had occurred, but not to develop the details); and giving stronger and more focused limiting instructions that confine the jury's consideration of the evidence for the specific purposes identified by the government and approved by the court, rather than the entire range of possible purposes identified in Rule 404, *see United States v. Miller*, 673 F.3d 688, 701-02 & n.1 (7th Cir. 2012); Seventh Cir. Pattern Crim. Jury Instr. 3.11 & Committee Comment. Roux's counsel has suggested that the court in this case should have expressly limited the jury's consideration of the Rule 404(b) evidence to motive and identity; yet, he also concedes that a more focused instruction was never proposed to the court and makes no case for plain error in the court's omission to give such an instruction on its own initiative. *See, e.g.*,

*United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012). As we have said, the record indicates that the district judge approached the Rule 404(b) evidence in this case with an appropriate degree of caution.

Roux's remaining points require only brief discussion. First, in addition to suggesting that the abuse that CC and SH described was not relevant because it did not involve the creation of sexually explicit photographs—a contention with which *Sebolt* dispenses—Roux has also emphasized that, in contrast to EV, they did not describe forced sexual acts. This point may reflect an unduly narrow view of force. In any case, force is not an element of the offense charged here. More to the point, as *Sebolt* makes clear, the prior acts were relevant to establish Roux's sexual interest in underaged girls, and thus his motive to cause EV to participate in the creation of sexually explicit photographs; any distinctions between the abuse that CC and SH suffered and the abuse inflicted on EV are immaterial in that regard. Second, Roux renews his contention that because DCFS found CC's allegations of abuse unfounded, her testimony was insufficient to establish that Roux, in fact, abused her. However, the authorities' decision not to pursue charges does not render CC's testimony incredible. *See Cookson v. Schwartz*, 556 F.3d 647, 655 (7th Cir. 2009) ("a conclusion by DCFS that an allegation is 'unfounded' does not establish that it is false") (citing *People v. Mason*, 578 N.E.2d 1351, 1356 (Ill. App. Ct. 1991) (DCFS decision not to pursue charges is neither a judicial decision nor a final determination that the victim's allegations were false)). Whether to credit her

testimony was thus the jury's prerogative. Finally, the fact that the abuse CC described took place four years before the charged photographs of EV were created does not render the prior acts too remote in time to be relevant. The prior acts were offered to establish Roux's sexual interest in minors, a proclivity that, as we pointed out in *Russell*, is unlikely to vanish with the passage of time. 662 F.3d at 848. More to the point, one can infer from the testimony that when Roux began to abuse CC in 2002, he commenced a long-term course of abuse that eventually included two of her sisters and continued largely unabated through the creation of the charged photographs of EV four years later. In the circumstances, the acts involving CC were not too remote in time to be admissible under Rule 404(b).

B.  Booking photographs of defendant

As we noted earlier, some of the photographs under-lying the section 2251(a) charge in this case depicted a man engaged in sexual intercourse with EV. EV would later testify that the man was Roux. The photographs themselves showed only the man's lower torso, not his face. One identifying characteristic that was evident from the photographs was that the male had a bit of a belly and was thus slightly overweight. By the time of trial, however, Roux (by EV's estimate) weighed some 30 to 40 pounds less than he had at the time of his arrest and appeared noticeably thinner to both EV and her mother at trial. The government was concerned that the jury, on observing a slender Roux in court, might be

inclined to discredit EV's testimony that the male torso depicted in the photographs belonged to Roux. The government thus sought to introduce at trial photographs taken of Roux at the time of Roux's arrest on state charges in May 2008 and again in February 2009, when federal authorities took over the prosecution and took him into their custody. These were standard booking photographs of Roux from the neck up; but they revealed a somewhat heavier Roux that the jury would see at trial, and to that end would support the government's position (and EV's testimony) that Roux was the individual shown in the photographs. Roux objected to the admission of the photographs out of concern that the jury would surmise (correctly) from the nature and dates of the photographs (which were communicated to the jury) not only that Roux had been arrested and incarcerated prior to trial, but also that his pretrial incarceration was a sign that he was a particularly dangerous individual. The district court found that the photographs were admissible for the purpose articulated by the government. None of the photographs contained any formal indicia (such as prison garb, booking numbers, or height indicator strips) indicating that they were jailhouse booking photographs. To minimize the possibility that the jury would recognize them as such, the court allowed into evidence only the two photographs depicting Roux facing forward and excluded photographs taken of Roux in profile.

Roux renews on his appeal his contention that the admission of the photographs undermined the presumption of innocence to which he was entitled for

the reasons he articulated to the district court. Notwith-standing the absence of overt signs that these were jail-house booking photographs, he asserts that it was obvious to the jury that the admitted photos were, in fact, mug shots. And because the jury knew that the photographs were taken on two different dates some nine months apart, he posits that jurors would have suspected either that he was regarded as so dangerous that he was denied release on bail, or that he committed a second offense resulting in another arrest (and photo) while on pretrial release for the first offense. He adds that there was no genuine need for the government to introduce the photographs, as he had not argued and never did argue based on his weight at the time of trial that he could not be the person depicted with EV in the charged photographs. At the same time, he could not explain that his weight loss was unintentional rather than purposeful and calculated, because to do so would have required him to confirm that he was incarcerated prior to trial and suffered weight loss due to bad jail food and a jailhouse attack that resulted in an injury requiring surgery and a lengthy stay in the jail infirmary.

The district court did not abuse its discretion in admitting the photographs. The government had a legitimate reason for offering them into evidence: Whether or not Roux argued that he could not be the man depicted in the charged photographs based on his trim physique at the time of trial (and, as we pointed out at oral argument, this was a suggestion that Roux could have reserved for closing argument), the jury might have wondered about this point on its own. The photographs

themselves do not strike us as particularly prejudicial. Having been informed that they are booking photos, it is easy to recognize them as such. Without that fore-knowledge, they also appear consistent with passport, driver's license, and workplace identification photo-graphs, which are often just as unflattering as these photographs of Roux are. Even if jurors correctly guessed the origin of these photographs, it would not have been a surprise to them that Roux had been arrested and photographed at that time, given that he had, after all, been indicted and placed on trial. The notion that they would have further inferred that he was denied bail because he was deemed too dangerous to be released (as opposed to lacking the money to post a bond, for example) or alternatively had committed another offense resulting in a subsequent arrest strikes us as too speculative to have compelled the exclusion of the photographs. Nor are we convinced that the photo-graphs called for some type of explanation from Roux for the weight loss: the government did not argue at trial that he had lost weight deliberately.

C.  Prosecutor's reference to "jail calls"

Roux cites an incident that occurred during trial as a second way in which the government undermined the presumption of innocence. During the cross-examination of Roux, the government played recordings of certain telephone conversations that Roux had while he was incarcerated prior to trial. (The recordings were offered to suggest that Roux had attempted to coach prospec-

tive witnesses to support his assertions as to his employ-
ment history.) The parties had discussed the recordings
prior to trial and had agreed that there would be no
mention that Roux was incarcerated at the time of the
calls. Yet, when the prosecutor sought to introduce the
recordings, he announced:

> At this time, Judge, I would move to introduce an
> exhibit that contains *these jail phone calls*. I discussed
> this with [defense counsel] with regard to the founda-
> tion. There is a stipulation for foundation. We had a
> witness present, but there's [a] stipulation about
> foundation.

R. 81 at 185, Tr. 588 (emphasis added). Roux's counsel
objected to the description of the recorded conversations
as "jail phone calls," and at sidebar informed the court
of the parties' prior agreement not to refer to them as
such. The court admitted the recordings after confirming
that the recordings themselves would (further) identify
them as jailhouse telephone calls. Roux moved for
a mistrial, which the court denied.

Roux contends that the court erred in refusing to
declare a mistrial given the prosecutor's disclosure that
he had been incarcerated prior to trial. The disclosure
was indeed unfortunate, although it appears to have
been inadvertent: the transcript of the sidebar conversa-
tion suggests that the prosecutor did not even realize
that he had described the conversations as "jail calls"
until defense counsel so informed him. R. 81 at 186,
Tr. 589. In any case, we have no reason to believe that
the single reference to "jail calls" deprived Roux of a

fair trial. The jury was properly instructed as to the pre-sumption of innocence in both the initial and final jury instructions. The one-time disclosure that Roux had been in jail prior to trial gives us no reason to doubt that the jury honored that presumption. *See United States v. Johnson*, 624 F.3d 815, 821-22 (7th Cir. 2010) (recordings of defendant's jailhouse telephone calls, which began with announcements identifying them as calls made from county jail, did not unduly prejudice defendant).

D.  Cross-examination of defendant as to lack of corrobo-rating evidence

Roux was the one and only defense witness. As we have noted, Roux denied that he had taken the sexually explicit photographs of EV or that he had forced her to take the photographs herself; he also denied that he had ever touched any of Roberta's daughters inappro-priately. Roux testified that at one point in time, he had been in the hospital and that when he was dis-charged, a doctor had advised him not to engage in sexual activity while he was recovering and/or indicated that the medication Roux had been prescribed might render him unable to engage in such activity. (EV had testified that it was at this point in time when Roux had first asked her to have intercourse with him, telling her he was dying; she refused.) Roux also testified that he was working odd jobs as a handyman for various individuals during the times that the government was suggesting he would have been at home alone and, for example, downloading the charged photographs to the

family computer and then transferring them to a USB drive. The prosecutor followed up on both of those points during cross-examination.

As to the physician who had told Roux that he should not or could not engage in sexual activity, the prosecutor asked Roux to state the doctor's name and indicate where his office was. Roux answered both questions. After having Roux confirm that his medical records would be on file with that doctor, the prosecutor asked Roux, "And they [the records] should reflect what you're telling this jury, right?" R. 81 at 172, Tr. 575. Roux agreed that they would.

On the matter of Roux's employment, the prosecutor asked Roux a series of questions aimed at establishing that he had not produced the sorts of records that would back up his claims that he had been working. For example, the prosecutor asked Roux whether he had payroll records for the time period during which he had lived with Roberta, and when Roux said that there were boxes of such records in Roberta's basement, the prosecutor inquired, "What have you done to get those?" and "Well, you've tried to get them, haven't you, or haven't you?" R. 81 at 177, Tr. 580. Roux said that he had tried, but without success. Next, the prosecutor, after having Roux confirm that his attorneys had an investigator working on his behalf, moved on to tax returns. Roux indicated those too were in the boxes in Roberta's basement, and among other things they would show that he had "claimed" EV (presumably as a dependent) on his return. The prosecutor observed, "That

would show—if you had those forms here in court, you could show that, right?" R. 81 at 177, Tr. 580. To which Roux responded, "If I had them, yes." R. 81 at 177, Tr. 580. Finally, in discussing various individuals who might be able to confirm his work history, the prosecutor asked Roux questions like "And why can't he back you up?" and "So if you were there during these times in May, they could back you up, right?" R. 81 at 182-83, Tr. 585-86.

Only after the last of these questions was asked did Roux's counsel begin to object. At that point, the judge, without being asked, took the opportunity to remind the prosecutor, in the jury's presence, that Roux was presumed innocent and bore no obligation to present evidence:

> DEFENSE COUNSEL: Judge—
>
> THE COURT: I'm going to have to intervene here. I have to make this point clear and it's going to have to affect your questioning from now on. The law is very clear that the defendant is not only presumed innocent, but he has no duty to prove his innocence or to present evidence or to testify, so—
>
> PROSECUTOR: That's understood.
>
> THE COURT: Well, I don't know. I want to be sure the jury understands that because there's a suggestion in your questions that he ought to be calling these people. He has absolutely no duty to present evidence.
>
> PROSECUTOR: Understood.

R. 81 at 183, Tr. 586. Roux subsequently moved for a mistrial based on the prosecutor's questions, which the court denied.

Despite the court's admonishment of the prosecutor in the jury's presence, Roux contends that the prosecutor's questions improperly shifted the burden of proof to him and (again) undermined the presumption of innocence. In Roux's view, the questions caused the jury to look to Roux and his counsel for an explanation as to why he had not presented evidence which would have corroborated his testimony. The court, in his view, was obliged to declare a mistrial.

We disagree. First, we have been skeptical of arguments that a prosecutor's comments on a defendant's failure to produce evidence improperly shift the burden of proof to the defense. So long as the jury has been properly instructed that the burden of proof belongs to the government and that the defendant has no burden to present any evidence, we have generally permitted comments on the lack of evidence supporting a theory of defense, provided that the comments do not implicate or "tax" the defendant's right not to testify. *See United States v. Glover*, 479 F.3d 511, 520 (7th Cir. 2007); *United States v. Wesley*, 422 F.3d 509, 516-17 (7th Cir. 2005); *United States v. Kelly*, 991 F.2d 1308, 1314 (7th Cir. 1993); *United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir. 1988); *United States v. DiCaro*, 852 F.2d 259, 263 (7th Cir. 1988); *United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir. 1987). Roux, of course, did testify, so there can be no concern that the jury might have penalized him

for exercising his Fifth Amendment privilege. *See Kelly*, 991 F.2d at 1314. Second, when the defendant elects to testify on his own behalf, the government, within reason, may through its questions and argument properly bring to the jury's attention the extent to which his version of events is uncorroborated and rests on his own credibility. *See Dahdah*, 864 F.2d at 59; *see also United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011); *United States v. Boulerice*, 325 F.3d 75, 86-87 (1st Cir. 2003) (coll. cases); *United States v. Cabrera*, 201 F.3d 1243, 1249-50 (9th Cir. 2000). Third, to the extent that the prosecutor in this case may have crossed the line with his repeated inquiries about the records and witnesses that might corroborate Roux's version of events but had not been presented (not to mention the reference to the investigator assisting the defense team), the district judge's timely and proactive reminder to the prosecutor and the jury that the defendant has no obligation to produce evidence was sufficient to address the problem. That reminder, coupled with the instructions to the same effect at the start and close of the trial, ensured that the jury properly understood that the burden of proof remained at all times with the government.

E.  Cumulative effect of alleged errors

Finally, we reject Roux's claim that the cumulative effect of the errors he has asserted deprived him of a fair trial even if, individually, they did not. The evidence to which Roux has objected was properly admitted,

and to the extent that the prosecutor stepped slightly over the line in the two instances we have discussed, the transgressions were not so serious, even in combination, as to have undermined the presumption of innocence and deprived Roux of a fundamentally fair trial.

## III.

Having rejected Roux's claims of trial error, we AFFIRM his conviction.