ROVNER, Circuit Judge, and WOOD, Chief Judge, and WILLIAMS, Circuit Judge, dissenting. I continue to believe, as I explained in the panel opinion, and as Chief Judge Wood’s dissent so persuasively .argues, that the state court failed to fulfill the Supreme Court’s mandate to review juvenile confessions with special care, and unreasonably held that Dassey’s confession was voluntary. And for all of the reasons upon which Chief Judge Wood has expounded and those set forth in the original panel opinion in Dassey v. Dittmann, 860 F.3d 933 (7th Cir. 2017), reh’g en banc granted, opinion vacated (Aug, 4, 2017), I too respectfully dissent. I write separately simply to point out the chasm between how courts have historically understood the nature of coercion and confessions and what we now know about coercion with the advent of DNA profiling and current social science research. Although I write in the hope of encouraging courts to update their understandings of the factual nature of coercion, my conclusion about the proper outcome of Dassey’s habeas petition does not depend on any change in law. Current Supreme Court precedent requires that a court view the totality of the circumstances of any interrogation, and to take special care when evaluating the confessions of juveniles. To comply with the command of the Supreme Court, therefore, a court must include within its evaluation of the .totality of the circumstances the impact of coercive interrogation techniques upon the particular vulnerabilities of the individual subject to those techniques. The state court did not do so in considering Dassey’s appeal. For this reason, Dassey’s conviction cannot stand.-Unfortunately, four members of the seven-member en banc panel of this court do not agree—a decision that I believe has worked a-profound injustice. Nevertheless, I hope to convince my colleagues throughout the courts that reform of our understanding of coercion is long overdue. When conducting a totality of the circumstances review, most courts’ evaluations of coercion still are based largely on outdated ideas about human psychology and rational decision-making. -It is time to bring our understanding of coercion into the twenty-first century. - . Half a century ago the Supreme Court held that police misrepresentations during interrogations, although relevant to a totality of the circumstances- inquiry, were not in’ and of themselves sufficient to render an otherwise voluntary confession inadmissible. Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). In other words, police may deceive, trick, conceal, imply, and mislead in any number of ways, provided that, under a totality of the circunjstances evaluation, they do not destroy a suspect’s ability to make a rational choice. See id. (finding an interrogator’s lie that a fellow- suspect had confessed insufficient to make an otherwise voluntary confession inadmissible); Procunier v. Atchley, 400 U.S. 446, 454, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971) (determining that it was not per se coercive for police to send in a cooperating insurance agent to deceive the defendant into confessing to obtain insurance payments for his children); see also United States v. Villalpando, 588 F.3d 1124, 1128 (7th Cir. 2009) (“Trickery, deceit, even impersonation do not render a confession "inadmissible”); United States v. Rutledge, 900 F.2d 1127, 1131 (7th Cir. 1990) (noting that “the law permits the police to pressure and cajole, conceal ma-teriál facts, and actively mislead—all up to limits”). These cases, however, were born in an era when the human intuition that told us that “innocent people do not confess to crimes” was still largely unchecked. This belief is rooted in-the mind’s tendency to assume that statements made to a police officer that are against one’s self interest can be trusted or, to put it simply, the thought that most of us have that “I would never confess to a crime I did not commit.”[1] Peer-reviewed studies confirm that jurors tend to have hard-to-dislodge beliefs that a suspect who is innocent could not be manipulated into confessing.[2] And, in fact, this false notion is precisely what the state implored the jurors in Dassey’s trial to believe, arguing in closing that “[pjeople who are innocent don’t confess.” R. 19-23 at 144. We know, however, that this statement is unequivocally incorrect. Innocent people do in fact confess, and they do so with shocking regularity. As of June. 7, 2016, The National Registry of Exonerations had collected data on 1,810 exonerations in the United States since 1989 (that number as of December 4, 2017 is 2,132), and that data includes 227 cases of innocent people who falsely confessed.[3] This research indicates that false confessions (defined as cases in which indisputably innocent - individuals confessed to crimes they did not commit) occur in approximately 25% of homicide cases.[4] In a world where we believed that “innocent people‘do not confess to crimes they did- not commit,” we were willing to tolerate a significant amount of deception by the police. Under this rubric, the thinking went, the innocent person (or at least the vast majority of healthy, sane, innocent adults of average intelligence) would not confess even in response to deception and cajoling. And so our case law developed in a factual framework in which we presumed that the trickery and deceit used by police officers would have little effect on the innocent. If it is true that, except in extreme cases, innocent people do not confess, what difference does it make if detectives Fass-bender and Wiegert made false-assurances and used deception in interrogating Das-sey? So what if they gave general assurances of leniency, :used leading questions, fed Dassey information, lied about how much information they had, told Dassey that they were on his side, implored him that “honesty is the only thing that will set you free,” suggested answers, and- even went so far as to tell a confused and floundering Dassey that Teresa had been shot in the head? “Dassey was not subject to physical coercion or any sort of threats at all,” the majority tells us, and “[gjiven the history of coercive interrogation techniques from which modern constitutional standards for confessions emerged, this is important.” Ante at 313. But what do we do when the facts that supported our “modern constitutional standards” come from a fifty-year-old understanding of human behavior, and when what we once thought we knew about the psychology of confessions we now know not to be true? Our long-held idea that innocent people do not confess to crimes has been upended by advances in DNA profiling. We know now that in approximately 25% of homicide cases in which convicted persons have later been unequivocally exonerated by DNA evidence, the suspect falsely confessed to committing the crime.[5] The majority points out that the number of known false confessions is low compared to the total number of guilty pleas to violent felonies. Ante at 317-18 n.8. This comparison is inappropriate for two reasons. First, the number of guilty pleas is the wrong denominator. Defendants plead guilty in all manner of situations, not only after interrogations by the police, as was the case with Dassey. Many defendants, for example, accept a plea after carefully weighing their options with a lawyer without ever having been subject to a coercive interrogation—the only type of confessions with which we are concerned in this case. Moreover, and more importantly, in the numerator, the statistics for false confessions include only those who have been exonerated based on some form of objective evidence (DNA, impossibility, the confession of another, etc.). The universe of people who falsely confess is undoubtedly larger than the subset of people who have confessed and then been fortunate enough to have been exonerated by objective, irrefutable evidence. But most importantly,- as the majority concedes, even one coerced false confession is “very troubling.” Ante at 317-18 n.8. Indeed any coerced false confession is an affront to due process and cannot stand. Certainly human intuition makes it almost inconceivable to imagine that someone might falsely confess to the murder of one’s own child. Yet in October 2004, Kevin Fox of Wilmington, Illinois did just that. He confessed to sexually assaulting his daughter, placing duct tape over her mouth, drowning her in the river, and then going home to sleep.[6],[7] His confession was detailed and included accounts of her moving and kicking in the water and struggling to remove the duct tape as she drowned. He quickly rescinded his confession, but spent eight months in prison until DNA testing ruled him out as a suspect and the State of Illinois dropped the charges. See generally Fox v. Hayes, 600 F.3d 819 (7th Cir. 2010). Not only did the DNA alone exclude him as a suspect, but for any who had remaining doubts, the conviction of another man six years later made it unequivocally certain that his. confession had been false. In 2010, Scott Eby, who was in prison for raping a relative, confessed to the murder.[8] At the jame of the murder he had been living not far from the Fox home. While drunk and high on cocaine Eby decided to rob some houses, and when he happened upon a sleeping three-year-old Riley Fox, he abducted her, sexually assaulted her, and then drowned her to cover his crime. His DNA matched that found on the duct tape used to bind Riley. A pair of boots, which had been found at the scene, photographed, and then ignored for years, had the name “Eby” written on the tongue. Five decades ago, when the'Supreme Court issued its opinions allowing interrogator deception, there was no DNA evidence that could demonstrate with such clarity that innocent people were confessing 'to crimes they had not committed at a surprising rate, and therefore, only a limited body of psychological science explaining why this happens. Even now, despite the overwhelming evidence regarding the coercive nature of constitutionally permissible interrogation techniques, we have not changed our understanding of how to view the facts surrounding coercion when evaluating the totality of the circumstances. Yet we now have a robust and growing body of rigorous, peer-reviewed, legal and'psychological research' demonstrating how' current interrogation tactics influence people, arid particularly juveniles and intellectually impaired people, to act against their own self-interest in such a seemingly irrational manner.[9] Some of the factors that induce false confessions are internal. Studies have demonstrated that personal .characteristics such as youth, mental illness, cognitive disability,, suggestibility, and a desire to please others ' may induce false confessions.[10] Á survey of false confession cases from 1989-2012 found that although only 8% of adult exonerees with no known mental'disabilities falsely confessed to crimes, in the population of exonerees who were younger than 18 at the time of the crime, 42% of exonerated defendants confessed to crimes they had not committed, as did 75% of exonerees who were mentally ill or meri-tally disabled.[11] Overall, one sixth of the exonerees were juveniles, mentally disabled, or* both, but they accounted for 59% of false confessions.[12] Indeed, yoüth and intellectual disability are the two most commonly cited characteristics of suspects who Confess falsely.[13] Dassey suffered under the weight of both characteristics. In addition to the factors specific to the suspect, some of the factors that induce false confessions are •externally imposed. These include “isolation, long interrogation periods, repeated accusations, .deception, presenting fabricated evidence, implicit/explicit threats of punishment or promises of leniency, and minimization or maximization of the moral seriousness or legal -consequences of the offence.”[14] “Maximization”, describes the technique whereby the interrogator exaggerates the strength -of the evidence and the magnitude of the charges.[15] Dassey’s interrogators employed maximization by constantly reminding Dassey, “We already know everything.” See, e.g., R. 19-25 at 17, 19, 23, 24, 26, 28, 30, 81, 36, 37, 41, 44, 47, 48, 50, 54, 55, 60, 63, 69, 71; “Minimization” describes tactics that are designed to lull a suspect into believing that thb magnitude of the charges and the seriousness of the offense will be downplayed or lessened if 'he confesses.[16] Studies demonstrate that minimization causes suspects to infer leniency to the same extent as if an explicit promise had been made, increasing not only the rates of true confessions (from 46% to 81% in one experiment) but also the rate of false confessions (from 6% to 18%),[17],[18] Although a court must exclude a confession obtained by direct promise of leniency (see, e.g., United States v. Villalpando, 588 F.3d 1124, 1128 (7th Cir. 2009)), the research demonstrates that minimization techniques are the functional equivalent in their impact on suspects.[19] The investigators in this case employed classic minimization techniques by repeatedly telling Dassey that it was not his fault that he committed the crime because his uncle, Steven Avery, had made him do it. See, e.g., R. 19-25 at 28, 47, 50, 60, 62. As Chief Judge Wood points out in her dissent, interrogators in this case, as in most police forces in the United States, used the Reid Technique to obtain Dassey’s confession. This technique involves isolation, confrontation,- maximization-' and minimization— the psychological strong-arm tactics that are known to produce coerced confessions even in adults of average intelligence. Dassey’s interrogation thus combined a perfect storm of these internal and exter: nal-elements. He was young, of low intellect, manipulable, without a friendly adult, and faced repeated accusations, deception, fabricated evidence, implicit and explicit promises of leniency, police officers disingenuously assuming the role of father figure, and assurances that it was not his fault.[20] , For many years, the Reid technique has been criticized by scholars and experts fór increasing the rate of false confessions.[21] As far back as Miranda, the Supreme Court warned that “[e]ven without employing brutality, the ‘third degree’ ” used in the Reid technique “exacts a heavy toll on individual liberty and trades on the weakness of individuals,” and “may even give rise to a false confession.” Miranda v. Arizona, 384 U.S. 436, 455 & n.24, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Recently, Wicklander-Zulawski & Associates, one of the nation’s largest police consulting firms, said it will stop training detectives in the method it has taught since 1984, stating that it “is not an effective way of getting truthful information.”[22] After a spate of high-profile false confession cases in the 1980’s, Great Britain transitioned from an accusatorial and coercive Reid-like approach to an investigative model of interviewing which prohibits deception, coercion, and minimization.[23] Meta-analyses of twelve different laboratory experiments indicate that the accusatorial approach increased both true and false rates of confessions, while the information-gathering approach increased the rate of true confessions without also increasing false confessions.[24] No reasonable state court, knowing what we now know about coercive interrogation techniques and viewing Dassey’s interrogation in light of his age, intellectual deficits, and manipulability, could possibly have concluded that Dassey’s confession was voluntarily given. Although it is my hope that our courts will, when evaluating the totality of the circumstances, engage with the more current understanding of coercion, as I noted at the start, Dassey does not need a change in our existing Supreme Court precedent or any existing law to prevail on his habeas petition. What has changed is not the law, but our understanding of the facts that illuminate what constitutes coercion under the law. Moreover, even under our current, anachronistic understanding of coercion, Dassey’s confession was so obviously and transparently coercively obtained that it is unreasonable to have found otherwise. Dassey, however, need not rely on this finding either. Existing Supreme Court precedent allows for significantly deceptive and manipulative interrogation techniques, but those very techniques must then be evaluated, in a totality of the circumstances analysis, for what they are. The requirement that confessions must be voluntary is a principle at the heart of our legal system. Although psychological and physical torture and coercion are commonplace in some countries as a means of obtaining “confessions,” our system of justice rejects the notion that convictions can be obtained through such abuse. We refuse to accept such conduct as a means of obtaining information, not only because it impacts the veracity of the confession, but because it is conduct that we as human beings cannot tolerate from our government. In a case such as this one, where investigators are faced with a crime of horrific brutality and the loss of a treasured life, the impulse to coerce a confession from a suspect may be particularly strong. As judges, we are entrusted with the responsibility to protect against such abusive actions, and uphold those principles that our Constitution protects even in the darkest of times. What occurred here was the interrogation of an intellectually impaired juvenile. Dassey was subjected to myriad psychologically coercive techniques but the state court did not review his interrogation with the special care required by Supreme Court precedent. His confession was not voluntary and his conviction should not stand, and yet an impaired teenager has been sentenced to life in prison. I view this as a profound miscarriage of justice. I respectfully dissent. . Saul M. Kassin et al, Police-Induced Confessions: Risk Factors and Recommendations, 34 L. & Hum. Behav. 49, 51 (2010). . ■ Iris Blandón-Gitlin et al., Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Infonn Them Otherwise?, 17 Psychol, Crime & L. 239, 256 (2011). . Samuel Gross et al., For 50 Years, You’ve Had "The Right to Remain Silent," The National Registry of Exonerations, False Confessions (June 12, 2016), http://www.law.umich. edu/special/exoneration/Pages/false-confessions.aspx. . Samuel Gross et al., Exoneration in the United States, 1989-2012: Report by the National Registry of Exonerations, 58, 60, https://www.law.umich.edu/special/ exoneration/Documents/exoneration s_us_l 989_2012_fulI_report.pdf. . Id. at 331. . Bryan Smith, Kevin Fox, in True Stories of False Confessions 107 (Rob Warden et al. eds., 2009). . Bryan Smith, The Nightmare: A Look at the Riley Fox Case, Chi. Mag., July 3, 2006. . Steve Schmadeke, I'm the 'Lowest Kind of Slime,’ Killer of 3-Year-Old Confessed. Court Records Outline Investigators' Path to Scott Wayne Eby, Chi. Trib., Feb. 26, 2011, . See Saul M. Kássin, False Confessions, 8 WIRES Cogn Sci. el439 (2017). . Blandon-Gitlin et al., supra note 2, at 240. . Gross, Exonerations 1989-2012, supra note 4, at 60. . Id. . Samuel R. Gross et al., Exonerations in the United States 1989 through 2003, 95 J. Crim. L. & Criminology 523, 545 (2005). . Blandón-Gitlin et al., supra note 2, at 240. . Saul M. Kassin et al., Police Interrogations and Confessions: Communicating Promises and Threats by Pragmatic Implication, 15 L. & Hum. Behav. 233, 234-35 (1991), . Id. at 235. . Id. at 241, 248. . Melissa B. Russano et al., Investigating True and False Confessions Within a Novel Experimental Paradigm, 16 Psychol. Sci. 481, 484(2005). . Kassin, Police Interrogations and Confessions, supra note 15, at 241, 248. . The majority has reservations about the use of the Gudjonsson Suggestibility. Scale and thus states that it can make no conclusions from the disputed expert testimony about the results. Ante at 305 n.2. Whatever one might make of the Gudjonsson Suggestibility Scále, the interrogation speaks for itself, Dassey is almost frantic in his desire to find the story the investigators seek. For example, in response to the question about what happened to Teresa’s head, Dassey, guessed at every possible injury or injustice to a head (hitting, punching, throat cutting, hair cutting) hoping to please the officers until, ifrustration, they finally informed .him that Teresa had been shot in the head. R. 19-25 at 60-63. In response to pressure from the investigators, he changes the locale of the crime from the house to the garage (Id. at 72-73), the color of Teresa's clothes (Id. at 20, 31-32), the location of the knife (Id., at 80-81, 121; R, 19-34 at 23-24, 27), whether Teresa was standing on the porch after school (R. 19-25 at 19-20, 27-28, 90-91), whether Avery went under-the hood of Halbach’s'car (Id. at 77-80), when the fire occurred (Id. at 23, 32-33; R. 19-34 at 55), and whether he cut her hair (R. 19-35 at 60-61; R. 19-34 at 36-37, 65-66, 98). Even under the state’s theory'of the case, the naive Dassey, who had never been in trouble with the law and- bad never had 4 sexual experience with a woman, was readily manipulated by his uncle into participating in a repulsive and heinous crime. One does not need the Gudjonsson. .Suggestibility Scale to conclude, under either party’s theory of tine case, that Dassey was highly suggestible and manipulable. .Kassin, False Confessions, supra note 9, at 8. . Eli Hager, The Seismic Change In Police Interrogations: A Major Player In Law Enforcement Says It Will No Longer Use A Method Linked To False Confessions, The Marshall Project (March 7, 2017, 10:00 p.m.), https:// www.themarshallproject.org,2017/03/07/the-seismic-change-in-police-interrogations. . Kassin, False Confessions, supra note 9, at 8. . Christian A. Meissner et al., Accusatorial and Information Gathering Interrogation Methods and Their Effects on True and False Confessions, A Meta-Analytic Review, 10 J. Exp. Criminology 459, 481-82 (2014).